RCH:EMR/EWS/RSB
F.#2023R00683

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No. 24-CR-465 (PKC)

LEON WILSON,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

Erin M. Reid
Eric Silverberg
Raffaela Belizaire
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. III

PRELIMINARY STATEMENT ............................................................................. 1

RELEVANT FACTUAL BACKGROUND............................................................. 2

ARGUMENT ......................................................................................................... 5

I.   Certain Evidence of Other Acts Is Directly Relevant to and Inextricably Intertwined
     with the Evidence of the Charged Crimes, or, in the Alternative, Is Admissible Under
     Federal Rule of Evidence 404(b)..................................................................... 5

     A. Overview of the Evidence the Government Intends to Present at Trial ........... 6

          1. The Defendant's Aggressive Conduct Towards an MDC-Brooklyn Inmate
             in the Weeks Leading up to the Shooting ........................................... 6
          2. Stop-And-Frisk on September 5, 2023................................................ 7

     B. Legal Standard........................................................................................... 8

          1. Direct Evidence ................................................................................. 8
          2. Fed. R. Evid. 404(b) .......................................................................... 9

     C. Discussion ............................................................................................... 12

          1. The Defendant's August 2023 Conduct.............................................. 12
          2. The September 5th Conduct ............................................................. 14

II.  The Court Should Admit the Victim's Statements to First Responders and Medical
     Providers, Which Do Not Constitute Hearsay or Fall Under a Well-Recognized Hearsay
     Exception.................................................................................................... 16

     A. Relevant Facts ......................................................................................... 16

     B. Applicable Law ........................................................................................ 17

          1. Rule 803(4): Statements for Medical Diagnosis or Treatment ................... 17
          2. Rule 803(2): Excited Utterances ...................................................... 17
          3. Rule 803(1): Present Sense Impressions ............................................ 19
          4. Rule 803(3): Then-Existing State of Mind or Condition ....................... 19
          5. Confrontation Clause........................................................................ 19

     C. Discussion ............................................................................................... 20

III.  The Court Should Preclude the Defendant from Introducing His Own Out-of-Court
      Statements under Rule 802 ................................................................................... 21

IV.   The Court Should Preclude the Defendant from Introducing Evidence and Arguments That
      Are Irrelevant and Would Result in Unfair Prejudice, Confusing the Issues, Misleading the
      Jury and Wasting Time ........................................................................................ 22

      A. Applicable Law .............................................................................................. 23

      B. Discussion ..................................................................................................... 24

          1.  The Court Should Exclude Excessive Evidence or Argument
              Concerning Contraband Smuggling ......................................................... 24
          2.  The Court Should Preclude Evidence or Argument Concerning
              the MDC-Brooklyn's Working Conditions, Including Inmate Violence ..................... 26
          3.  The Court Should Exclude Evidence About the Background of
              the Other Occupants of the BMW and Inmate-2, Including Inmate-2's
              Criminal and Disciplinary History ........................................................... 29
          4.  The Court Should Preclude Evidence or Argument Concerning the Defendant's
              Prior Commission of "Good Acts" Or Non-Commission of Other Bad Acts ............. 30
          5.  The Court Should Preclude Any Evidence or Argument Concerning Possible
              Punishment or Collateral Consequences ..................................................... 32

V.    The Defendant Should Be Ordered To Disclose Rule 16(b) Discovery, Including Experts He
      Intends to Call, Rule 26.2 Material, and Trial Exhibits To Be Introduced During the
      Government's Case .............................................................................................. 34

      A. Rule 16(b) Discovery and Trial Exhibits ........................................................... 34

      B. Expert Notice ................................................................................................. 36

      C. Rule 26.2 Material .......................................................................................... 37

CONCLUSION .............................................................................................................. 38

## TABLE OF AUTHORITIES

Page(s)

### CASES

Abu Dhabi Comm. Bank v. Morgan Stanley & Co.,
No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ............................... 28

Branham v. Lee,
No. 10 Civ. 3074 (NRB), 2011 WL 5979530 (S.D.N.Y. Nov. 29, 2011) .............................. 21

Crawford v. Washington,
541 U.S. 36 (2004) ............................................................................................................. 20

Crease v. McKune,
189 F.3d 1188 (10th Cir. 1999) .......................................................................................... 27

Davis v. Alaska,
415 U.S. 308 (1974) ........................................................................................................... 34

Davis v. Washington,
547 U.S. 813 (2006) ........................................................................................................... 20

Garlick v. Lee,
1 F.4th 122 (2d Cir. 2021) ............................................................................................ 20, 21

Michigan v. Bryant,
562 U.S. 344 (2011) ........................................................................................................... 20

Old Chief v. United States,
519 U.S. 172 (1997) ......................................................................................................... 8, 23

Screws v. United States,
325 U.S. 91 (1945) ............................................................................................................. 12

Shannon v. United States,
512 U.S. 573 (1994) ........................................................................................................... 33

Smith v. Arizona,
144 S. Ct. 1785 (2024) ....................................................................................................... 20

United States v. Aiyaswamy,
No. 15-CR-568 (LHK), 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) ................................. 36

United States v. Aminy,
15 F.3d 258 (2d Cir. 1994) ................................................................................................. 10

United States v. Araujo,
  79 F.3d 7 (2d Cir. 1996) ........................................................................... 11

United States v. Bailey,
  444 U.S. 394 (1980) ................................................................................. 24

United States v. Bakhtiari,
  913 F.2d 1053 (2d Cir. 1990) ................................................................... 24

United States v. Baykoff,
  67 F. App'x 15 (2d Cir. 2003) .................................................................. 30

United States v. Benedetto,
  571 F.2d 1246 (2d Cir. 1978) ................................................................... 31

United States v. Blume,
  967 F.2d 45 (2d Cir. 1992) ....................................................................... 33

United States v. Boen,
  19 Cr. 20037 (TLB) (W.D. Ark. July 27, 2021) ...................................... 27

United States v. Boone,
  828 F.3d 705 (8th Cir. 2016) .................................................................... 11

United States v. Brugman,
  364 F.3d 613 (5th Cir. 2004) .................................................................... 12

United States v. Carboni,
  204 F.3d 39 (2d Cir. 2000) .......................................................... 8, 13, 14

United States v. Cardascia,
  951 F. 2d 474 (2d Cir. 1991) .................................................................... 19

United States v. Chang,
  No. 18-CR-00681 (NGG) (CLP), 2024 WL 3303717 (E.D.N.Y. July 3, 2024) ..................... 24

United States v. Chueng Kin Ping,
  555 F.2d 1069 (2d Cir. 1977) ................................................................... 28

United States v. Coonan,
  938 F.2d 1553 (2d Cir. 1991) ............................................................. 9, 13

United States v. Cowden,
  883 F.3d 464 (4th Cir. 2018) .................................................................... 11

United States v. Daly,
  842 F.2d 1380 (2d Cir. 1988) ..................................................................... 9

United States v. Dawkins,
   999 F.3d 767 (2d Cir. 2021) ........................................................................ 31, 32

United States v. DiMarzo,
   80 F.3d 656 (1st Cir. 1996) .............................................................................. 33

United States v. Edwards,
   631 F.2d 1049 (2d Cir. 1980) .......................................................................... 33

United States v. Everett,
   825 F.2d 658 (2d Cir. 1987) ............................................................................ 11

United States v. Fazio,
   No. S2 11 Cr. 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) ............... 31

United States v. Funches,
   135 F.3d 1405 (11th Cir. 1998) ....................................................................... 27

United States v. Gonzalez,
   110 F.3d 936 (2d Cir. 1997) ............................................................................. 8

United States v. Graham,
   No. 14-CR-500 (NSR), 2015 WL 6161292 (S.D.N.Y. Oct. 20, 2015) ................... 21

United States v. Holden,
   No. 13-CR-444, 2015 WL 1514569 (D. Or. Mar. 19, 2015) ................................ 36

United States v. Hsia,
   No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) .................. 34, 35

United States v. Hsu,
   669 F.3d 112 (2d Cir. 2012) ........................................................................... 23

United States v. Ibanez,
   328 F. App'x 673 (2d Cir. 2009) ...................................................................... 19

United States v. Inserra,
   34 F.3d 83 (2d Cir. 1994) ................................................................................ 9

United States v. Jackson,
   No. 19-CR-356 (ARR), 2021 WL 62109 (E.D.N.Y. Jan. 7, 2021) ....................... 30

United States v. Javice,
   No. 23 Cr. 251 (AKH), 2025 WL 278885 (S.D.N.Y. Jan. 23, 2025) ..................... 37

United States v. Johnson,
   117 F.4th 28 (2d Cir. 2024) ....................................................................... 18, 20

United States v. Jones,
    299 F.3d 103 (2d Cir. 2002) ................................................................. 18, 19

United States v. Josephberg,
    562 F.3d 478 (2d Cir. 2009) ....................................................................... 28

United States v. Krug,
    No. 15-CR-157-A, 2017 WL 907817 (W.D.N.Y. Mar. 8, 2017) ...................................... 11, 12

United States v. Kwong,
    69 F.3d 663 (2d Cir. 1995) ....................................................................... 24

United States v. Langford,
    990 F.2d 65 (2d Cir. 1993) ......................................................................... 9

United States v. Larkin,
    No. 2:12-CR-319 (GWF), 2015 WL 4415506 (D. Nev. July 20, 2015) ................................. 36

United States v. Levin,
    No. 15-cr-101, 2016 WL 299031 (S.D.N.Y. Jan. 25, 2016) ........................................... 24

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) ....................................................................... 10

United States v. Lewis,
    110 F.3d 417 (7th Cir. 1997) ...................................................................... 33

United States v. Livoti,
    196 F.3d 322 (2d Cir. 1999) ....................................................................... 11

United States v. Marin,
    669 F.2d 73 (2d Cir. 1982) .................................................................... 21, 22

United States v. Mickens,
    926 F.2d 1323 (2d Cir. 1991) ................................................................. 10, 14

United States v. Napout,
    No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .............................. 24, 35

United States v. Ortiz,
    857 F.2d 900 (2d Cir. 1988) ........................................................................ 9

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ...................................................................... 24

United States v. Paul,
    110 F.3d 869 (2d Cir. 1997) ....................................................................... 24

United States v. Paulino,
   445 F.3d 211 (2d Cir. 2006) ..................................................................... 10

United States v. Peterson,
   808 F.2d 969 (2d Cir. 1987) ..................................................................... 10

United States v. Pitre,
   960 F.2d 1112 (2d Cir. 1992) ................................................................ 9, 10

United States v. Polouizzi,
   564 F.3d 142 (2d Cir. 2009) ..................................................................... 27

United States v. Rivera,
   No. 13-cr-149, 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ........................... 24, 31

United States v. Robert Hadden,
   No. 23-6822-CR, 2024 WL 4456203 (2d Cir. Oct. 10, 2024)............................ 17

United States v. Rodella,
   804 F.3d 1317 (10th Cir. 2015) ................................................................ 12

United States v. Rushin,
   844 F.3d 933 (11th Cir. 2016) .................................................................. 27

United States v. Scarpa,
   897 F.2d 63 (2d Cir. 1990) ...................................................................... 30

United States v. Scarpa,
   913 F.2d 993 (2d Cir. 1990) ................................................................ 18, 20

United States v. Smothers,
   652 F. Supp. 3d 271 (E.D.N.Y. 2023) ......................................................... 35

United States v. Swenson,
   298 F.R.D. 474 (D. Idaho 2014).................................................................. 35

United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) ................................................................ 27, 33

United States v. Tocco,
   135 F.3d 116 (2d Cir. 1998) ............................................................. 17, 18, 21

United States v. Towne,
   870 F.2d 880 (2d. Cir. 1989) ..................................................................... 8

United States v. Ulbricht,
   858 F.3d 71 (2d Cir. 2017) ....................................................................... 37

United States v. Walker,
    191 F.3d 326 (2d Cir. 1999) ............................................................... 32

United States v. Watson and Ozy Media, Inc.,
    No. 23 Cr. 82 (EK) 2024 WL 4455773 (E.D.N.Y. May 31, 2024) .................................... 18, 37

United States v. White,
    68 Fed. App'x 707 (7th Cir. 2003) ......................................................... 11

United States v. Yousef,
    327 F.3d 56 (2d Cir. 2003) ............................................................... 22

## STATUTES

18 U.S.C. § 242 ............................................................................ passim

## RULES

Fed. R. Crim. P. 16 ................................................................. 34, 35, 36

Fed. R. Crim. P. 16(b)(1)(A) ................................................................ 34

Fed. R. Crim. P. 16(b)(1)(C) ................................................................ 36

Fed. R. Evid. 401 ........................................................................ 8, 32

Fed. R. Evid. 402 ...................................................................... 8, 23, 32

Fed. R. Evid. 403 ......................................................................... 23, 33

Fed. R. Evid. 404(a)(2)(A) ................................................................. 31

Fed. R. Evid. 404(b) ........................................................................ 9

Fed. R. Evid. 404(b)(2) ..................................................................... 9

Fed. R. Evid. 405(a) ....................................................................... 31

Fed. R. Evid. 801(d)(2)(A) ................................................................. 21

Fed. R. Evid. 803(1) ....................................................................... 19

Fed. R. Evid. 803(2) ....................................................................... 17

Fed. R. Evid. 803(3) ....................................................................... 19

Fed. R. Evid. 803(4) ....................................................................... 17

PRELIMINARY STATEMENT

This case arises out of an incident that occurred on September 4, 2023, when the defendant was working as a correctional officer at the Metropolitan Detention Center in Brooklyn, New York ("MDC-Brooklyn").  As described in more detail below, the defendant, while on duty and driving a minivan issued by the Bureau of Prisons ("BOP"), chased a gray BMW off MDC-Brooklyn property and through a large section of Brooklyn.  During that high-speed chase, and while several blocks away from MDC's property line, the defendant fired multiple gunshots towards the BMW.  One of the bullets struck the BMW's back passenger (the "Victim"), penetrating his back, lungs, and chest.  The defendant never reported the incident—neither the chase nor the shooting—to his supervisors at MDC-Brooklyn, the BOP, or any other law enforcement officer.  His conduct violated several rules and regulations, including those governing the use of deadly force by Department of Justice ("DOJ") personnel, and deprived the Victim of his constitutional right to be free from unreasonable force and seizure under the Fourth Amendment.

Trial in this matter is scheduled to commence on October 20, 2025.  The government respectfully moves in limine (1) to admit evidence of certain crimes and acts not detailed in the Indictment; (2) to admit evidence of certain out-of-court statements that do not constitute hearsay or that fall within an exception to the bar against hearsay; (3) to preclude the defendant from offering his own out-of-court hearsay statements; (4) to preclude certain evidence and arguments that are inadmissible under Rule 402, and otherwise barred by Rule 403; and (5) for an order requiring the defendant to disclose Rule 16(b) materials, witness statements, and expert notices.

## RELEVANT FACTUAL BACKGROUND[1]

The defendant has been a correctional officer at the MDC-Brooklyn since 2000. He served in the military before working for the BOP.

On September 4, 2023, the defendant was on duty at the MDC-Brooklyn between the hours of 12:00 a.m. through 12:00 p.m. and assigned to an exterior outpost, where he was responsible for monitoring the perimeter near the facility's Receiving and Discharge ("R&D") wing, the area of the prison where inmates are processed into and out of the institution. Outpost perimeter officers are responsible for protecting the facility, guarding against inmate escape and deterring and preventing smugglers from bringing contraband into the MDC-Brooklyn. Unlike most postings inside the facility, outpost perimeter officers are armed. Notably, correctional officers are not police officers. Instead, pursuant to Title 18, United States Code, Section 3050 and DOJ policy, correctional officers are not permitted to arrest or detain persons who are not on BOP property except in very limited circumstances not applicable here.

Between the hours of 4:00 a.m. and 5:00 a.m. on September 4th, video surveillance captured the defendant driving a white Dodge Caravan minivan bearing a U.S. government license plate with numbers J0029NYM, which was registered to the BOP and assigned to the MDC-Brooklyn (the "BOP van"). At approximately 4:30 a.m., despite being on duty, the defendant left his post and drove the BOP van offsite towards the nearby 25th Street subway station, where he exited his vehicle, went inside the station, and purchased a MetroCard. The defendant returned to the MDC-Brooklyn approximately five minutes later, parked across the staff parking lot, and waited inside the BOP van.

---

[1]    The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial.

Around the time that the defendant arrived back at the MDC-Brooklyn in the BOP van, a gray BMW M3 4-door sedan with tinted windows (the "BMW") pulled into the MDC-Brooklyn's staff parking lot. There were three occupants inside the BMW, including: (1) the Victim, who was seated in the back passenger row, (2) the owner of the BMW, a female who was seated in the front passenger seat, and (3) the driver, a male who was seated in the driver's seat. There was no legitimate reason for the BMW to be parked in the MDC-Brooklyn staff parking lot at that hour. The occupants of the BMW were present at the MDC-Brooklyn because they intended to smuggle contraband inside the facility, although they did not ultimately do so.

After the BMW arrived at the staff parking lot, the BMW and the BOP van idled in their respective places for several minutes. After minutes of idling, at approximately 4:45 a.m., the defendant drove the BOP van into the staff parking lot and brought the nose of the van within feet of the BMW. The BMW immediately raced away. As the BMW sped off MDC-Brooklyn property, the defendant abandoned his post, left BOP property, and gave chase in the BOP van, in violation of BOP rules and procedures.

Multiple surveillance cameras captured the high-speed car chase. It lasted for nearly eight minutes and spanned several miles of Brooklyn, stretching all the way to the edge of the Brooklyn Bridge. Despite the length of the chase, the defendant never called the police, alerted anyone at the MDC-Brooklyn, or returned to his post. Instead, the defendant ran a red light, weaved around other cars, and even sped past someone riding a bicycle, all in an effort to bring the BOP van within striking distance of the BMW. Approximately two minutes after the chase began—and nearly a mile from his post—the defendant fired several gunshots towards the BMW. Multiple rounds hit the BMW, including one that went through the rear of the car and struck the Victim in the back, penetrating the lungs and chest. At all times during the chase, including when

3

the defendant shot the Victim, the BMW was in front of the BOP van. The defendant was the only person in the BOP van. He fired at the BMW while driving at a high rate of speed and despite the risk firing a weapon out of a moving vehicle posed to other motorists on the road.

Even after shooting the Victim, the defendant continued to pursue the BMW. He continued the chase on the Brooklyn-Queens Expressway and ultimately up to the edge of the Brooklyn Bridge, after which the defendant turned back. The BMW crossed into Manhattan and came upon an ambulance. The Victim was rushed to Bellevue Hospital and treated for a gunshot wound. He survived, though, to this day, he continues to struggle with lingering pain from the shooting.

The defendant ultimately was off BOP property for more than 15 minutes. When he returned to the MDC-Brooklyn, a fellow correctional officer asked him what happened. The defendant admitted that he chased the BMW out of the MDC-Brooklyn but did not say anything about firing his weapon or shooting at the BMW. Nor did the defendant ever file a report with his superiors about this incident, despite clear rules requiring BOP employees to report, within 24 hours, any firearm discharge events while on duty.

The defendant was initially arrested pursuant to a criminal complaint. On November 14, 2024, a grand jury in this District returned the instant Indictment charging the defendant with two counts: (1) deprivation of rights under color of law, in violation of Title 18, United States Code, Section 242 (Count One); and (2) discharging a firearm during a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count Two).

## ARGUMENT

I.    Certain Evidence of Other Acts Is Directly Relevant to and Inextricably Intertwined
with the Evidence of the Charged Crimes, or, in the Alternative, Is Admissible Under
Federal Rule of Evidence 404(b)

At trial, the government intends to admit evidence relating to the defendant's other acts beyond those specifically charged in the Indictment.[2]  This includes (i) evidence of the defendant's threatening behavior towards an inmate at the MDC-Brooklyn in or about August 2023, just a few weeks before the conduct at issue here; and (ii) evidence that the defendant conducted a stop-and-frisk off MDC-Brooklyn property on September 5, 2023, the day after the conduct at issue here, and filed a report falsely claiming that it occurred on BOP property.  As set forth below, these incidents are direct evidence of and inextricably intertwined with the charged crimes and are necessary to complete the story of the crime on trial.

In the alternative, to the extent the Court finds that the evidence described above constitutes "other acts" under Federal Rule of Evidence 404(b), it is admissible for the non-propensity purposes of showing the defendant's knowledge, intent, common scheme or plan, and modus operandi.  Most significant, the proffered evidence is admissible to prove that the defendant acted willfully in committing the charged crimes, which the government must prove to establish a violation of 18 U.S.C. § 242.  Moreover, for the reasons set forth below, all the evidence identified above is admissible and passes Rule 403's balancing test.

---

[2]    Should the defendant decide to testify, the government reserves the right to cross-examine the defendant about other aspects of his tenure as a correctional officer, including prior disciplinary incidents and/or interactions with inmates and other BOP staff members.

A.      Overview of the Evidence the Government Intends to Present at Trial

     1.      The Defendant's Aggressive Conduct Towards an MDC-Brooklyn
          Inmate in the Weeks Leading up to the Shooting

The first category of evidence the government seeks to introduce pertains to a series of interactions that the defendant had with an inmate at the MDC Brooklyn ("Inmate-1") in August 2023, shortly before the September 4, 2023 shooting.  These interactions, which pertained to contraband smuggling, were aggressive in nature.  The defendant's conduct during some of these interactions violated applicable BOP rules governing the use of force towards inmates.[3]

On one occasion, the defendant was riding in an elevator with Inmate-1 and other inmates when the defendant, unprompted and in an aggressive manner, announced that he would catch all the inmates bringing in contraband.  Shortly thereafter, the defendant approached Inmate-1 and a second inmate and told them that he had chased Inmate-1's female friend driving a silver Honda off MDC-Brooklyn property.  While resting his hand on his gun, the defendant threatened that if the woman ever returned to the MDC-Brooklyn, Inmate-1 would be going to an early funeral because the defendant would put a bullet in the woman's head.

During another encounter, the defendant and Inmate-1 got into a verbal altercation about an area of the facility that Inmate-1 was responsible for cleaning.  During the encounter, the defendant accused Inmate-1 of hiding contraband in a garbage can and threatened to hit Inmate-1 with his firearm.  When Inmate-1 responded that the gun shot rubber bullets, the defendant—to drive his point home—took out his gun, cocked it, and sent a bullet flying from the chamber.

In another exchange, the defendant made a comment to Inmate-1 while Inmate-1 was walking into an MDC-Brooklyn building and the defendant was inside of an outdoor guard

---

[3]      Unless otherwise specified, all statements described in this section are related in sum and substance and in part.

post in front of the building.  In response, Inmate-1 yelled a vulgar insult at the defendant.  The

defendant yelled back at Inmate-1 and started following him into the MDC-Brooklyn building.

Inmate-1 walked into the MDC-Brooklyn building with his hands in the air to demonstrate he did

not pose a threat to the defendant.  Inside the building, the defendant grabbed Inmate-1 by the arm,

violently threw him up against the wall, and needlessly bent his fingers and arm behind his back

while yelling, "I will fucking kill you."

       2.    Stop-And-Frisk on September 5, 2023

      The second category of evidence that the government seeks to introduce is evidence

of a report the defendant filed in connection with a stop-and-frisk that occurred on September 5,

2023, the day after the September 4th shooting.  As set forth above, the defendant did not make

any reports about the September 4th shooting to his supervisors at the MDC-Brooklyn.  Instead,

after he abandoned the chase of the BMW that day, the defendant returned to the MDC Brooklyn

and finished his shift.

      On September 5, 2023, the defendant was again assigned to an outdoor perimeter

post at the MDC-Brooklyn.  During the defendant's shift, video surveillance captured a civilian

walking on MDC-Brooklyn property while carrying a bag.  The video then captured the defendant

driving a BOP van and following the civilian up the block from the MDC-Brooklyn, two city

blocks off BOP property.  He exited the van, detained the civilian, frisked him, searched the bag,

and recovered a green leafy substance, rope, and bottles of medicine.  The defendant later

submitted a signed, written statement about the incident falsely suggesting that he had conducted

a pat search on MDC-Brooklyn grounds, near the staff parking lot.

      MDC-Brooklyn personnel initiated an investigation into the defendant's false

statements about the location of the stop and frisk on September 5, 2023.  In the course of the

investigation, the New York City Police Department ("NYPD") alerted the MDC-Brooklyn that

one of the MDC-Brooklyn's vans was involved in a shooting on September 4, 2023. Because the defendant was already under investigation for his conduct on September 5, 2023, MDC-Brooklyn investigative staff readily identified the defendant as the person behind the wheel of the BOP van on September 4, 2023. He was placed on administrative leave days later.

B.    <u>Legal Standard</u>

1.    <u>Direct Evidence</u>

It is well settled that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000) (quoting <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997)); <u>see also</u> <u>United States v. Towne</u>, 870 F.2d 880, 886 (2d. Cir. 1989) (same). In considering such evidence, the Second Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." <u>Gonzalez</u>, 110 F.3d at 941. "Relevant evidence is not confined to that which directly establishes an element of the crime." <u>Id.</u>; <u>see also</u> Fed. R. Evid. 401, 402. Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." <u>Old Chief v. United States</u>, 519 U.S. 172, 183 (1997).

The Second Circuit has repeatedly upheld the admission of uncharged act evidence as direct evidence of the charged crimes where such evidence provides necessary background or context for the charged crimes. <u>See</u> <u>Gonzalez</u>, 110 F.3d at 941-42 (uncharged burglary admissible in trial for felon in possession of a firearm because, <u>inter alia</u>, it provided "crucial background

evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Langford, 990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").  In this respect, "trial court[s] may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

  2. Fed. R. Evid. 404(b)

    Evidence of uncharged crimes or "other acts" may be admitted pursuant to Rule 404(b) for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).  Rule 404(b) evidence is only admissible if, under Rule 403, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or by considerations of judicial economy such as the needless presentation of cumulative evidence.  Id.  Even where there is a risk of undue prejudice, such risk can be mitigated effectively

9

by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  See United States v. Mickens, 926 F.2d 1323, 1329 (2d Cir. 1991).

The Second Circuit has established a three-prong test for the admission of "other acts" evidence under Rule 404(b).  First, a trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity.  See Pitre, 960 F.2d at 1119; Mickens, 926 F.2d at 1328.  Second, the trial court must determine that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and that its probative value is not substantially outweighed by the danger of unfair prejudice.  See Pitre, 960 F.2d at 1119; Mickens, 926 F.2d at 1328.  Third, the court must provide an appropriate limiting instruction to the jury, if one is requested.  See Pitre, 960 F.2d at 1119.

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) (internal citation omitted), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a rule of broad reach and liberal application.  Id.  ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").  To the extent that evidence of an uncharged crime is offered to prove knowledge or intent (i.e., state of mind), the law requires that the other act and the charged conduct be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence," else it would not be relevant.  United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) (quoting United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987) (internal quotation marks omitted)); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior arrest for small amount of cocaine base street-level distribution sufficiently similar to prove knowledge and intent for charged crime of possession of large amount

10

of powder cocaine in residence); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996) (explaining similarity rule for knowledge and intent proof is "simply a rule of relevance"). "Other acts" evidence under Rule 404(b) can also be admitted to "corroborate crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant." United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted).

In cases involving violations of 18 U.S.C. § 242, courts in the Second Circuit and elsewhere have found that the government has considerable latitude under Rule 404(b) to offer evidence that might make the defendant's intent more probable. See, e.g., United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (in § 242 prosecution, affirming decision to admit, pursuant to Rule 404(b), evidence that the defendant had choked another arrestee in the past "because it was relevant to rebut [the defendant's] assertion that he choked [the victim] unintentionally"); United States v. Krug, No. 15-CR-157-A, 2017 WL 907817, at *2 (W.D.N.Y. Mar. 8, 2017) ("Put simply, the Supreme Court's interpretation of the word "willfully" in § 242 opens the door to a variety of evidence that might make the Defendant's intent "more ... probable."); United States v. Cowden, 883 F.3d 464, 473 (4th Cir. 2018) (in § 242 prosecution, admitting two prior bad acts part on "the government's heavy proof burden"); United States v. White, 68 Fed. App'x 707, 710-11 (7th Cir. 2003) (in § 242 prosecution, affirming admission of other-acts evidence to prove willfulness because the other-acts evidence "demonstrated ... that [the defendant] was on notice that the use of unnecessary force under color of law is illegal and, more specifically, that unreasonable force in response to non-threatening verbal comments was in excess of his authority"); United States v. Boone, 828 F.3d 705, 711 (8th Cir. 2016) (in § 242 prosecution, concluding that "[e]vidence of Boone's use of unreasonable force against [one victim of prior bad act] was relevant to prove that Boone acted willfully when he deprived [the victim of charged offense] of his right to be free from

11

unreasonable force."); United States v. Brugman, 364 F.3d 613, 620 (5th Cir. 2004) (in § 242 prosecution, affirming admission of bad act evidence and observing, "[b]ecause the crime for which Brugman was charged has as an element an intent requirement, Brugman's intent was at issue, and the admission of extrinsic evidence could therefore be relevant to prove intent."); United States v. Rodella, 804 F.3d 1317, 1334 (10th Cir. 2015) (in § 242 prosecution, affirming admission of bad act evidence and observing, "the government sought admission of evidence of the other three similar acts to assist in proving willfulness, which was an essential element of the 18 U.S.C. § 242 charge.").  This is because § 242 requires the government to prove that the defendant acted willfully, meaning that he knew his conduct violated federal rights and intended that result.  Screws v. United States, 325 U.S. 91, 103 (1945); see also Krug, 2017 WL 907817, at *3 ("§ 242 does not merely proscribe the use of excessive force; rather, it proscribes the use of excessive force with the intent to violate the alleged victim's constitutional right to be free of such force).

     C.    <u>Discussion</u>

       As set forth below, the proffered evidence of the defendant's conduct towards Inmate-1 in August 2023 just weeks before the shooting and his actions on September 5, 2023, the day after the shooting, are both directly relevant to and inextricably intertwined with the evidence of the charged crimes.  They are both also admissible under Rule 404(b) to prove that the defendant acted willfully on September 4, 2023, and for several other permissible purposes.  Finally, the probative value of the proffered evidence substantially outweighs any prejudicial effect under Rule 403.

     1.    <u>The Defendant's August 2023 Conduct</u>

       The defendant's conduct toward Inmate-1 is direct evidence of the charged crimes—not "other acts" at all.  The August 2023 incidents arose from the same ongoing pattern of misconduct that culminated in the September 4th shooting and reflect the defendant's relentless

focus on contraband smuggling, his willingness to resort to threats and violence, and his inclination to act outside of his legal authority to police contraband smuggling.  The defendant's pattern of abandoning proper procedures, making violent threats, and acting outside his authority is precisely the type of background evidence courts routinely admit to "complete the story" and provide necessary context.  See Carboni, 204 F.3d at 44.  Indeed, the August 2023 conduct explains the "understanding or intent with which certain acts were performed" on September 4th.  See Coonan, 938 F.2d at 1561.  Moreover, the temporal proximity between the August 2023 threats and the September 4th shooting reinforces that these acts form a continuous narrative of the defendant's mounting obsession with contraband smuggling and his willingness to act outside the law and use deadly force against suspected smugglers.

Even if characterized as "other acts," the August 2023 evidence satisfies Rule 404(b)(2) because it provides proof that the defendant acted willfully on September 4, 2023. Indeed, the defendant's escalating threats to Inmate-1 about contraband smuggling in August 2023—including his explicit promise to put a bullet in a suspected smuggler's head—spotlights his state of mind when he encountered suspected contraband smugglers in the BMW on September 4th and makes clear that his decision to shoot at the BMW was not a product of mistake or accident. This evidence also establishes the defendant's plan of aggressive and deadly enforcement.  In August 2023, he confronted a suspected smuggler with escalating threats of deadly force.  In September 2023, he carried out those threats.  The pattern is identical:  abandon proper procedure, pursue suspected smugglers, apply lethal force.

This case is similar to Livoti, where the Second Circuit affirmed a district court's decision to admit evidence that a police officer had choked an arrestee in the past in a case where the defendant was charged with violating § 242 for using a chokehold to restrain a victim.  The

Second Circuit held that the other act evidence was relevant "to rebut [the defendant's] assertion that he choked [the victim] unintentionally," and was otherwise admissible because it did not involve conduct more inflammatory than the charged crime and the district court gave the jury a limiting instruction. 196 F.3d at 326.

The August 2023 evidence also counters an anticipated self-defense claim that he was reacting to a perceived threat from the fleeing BMW. It demonstrates that when the defendant shot the Victim, he was not reacting to any kind of threat. He was making good on a longstanding promise to kill anyone who tried to cross him on his watch.

As in Livoti, moreover, the probative value of the August 2023 incidents outweighs any prejudicial effect. The August 2023 incidents involve verbal threats and improper searches—conduct that is far less inflammatory than the charged shooting. The probative value in proving the defendant's intent and knowledge is enormous, particularly given that intent will be the central disputed issue at trial. And in any event, any potential prejudice to the defendant can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See, e.g., Mickens, 926 F.2d at 1328-29. The jury can reasonably draw the inference that someone who explicitly threatened to shoot contraband smugglers acted on that stated intent when he fired at suspected smugglers weeks later.

2.    The September 5th Conduct

The September 5th stop-and-frisk is also admissible both as direct evidence of the charged offenses and of the defendant's state of mind during the charged offenses.

First, evidence of the September 5th stop-and-frisk is inextricably intertwined with the charged offenses and necessary to "complete the story" of the charged crimes. See Carboni, 204 F.3d at 44. Indeed, the government expects that the evidence will prove that the defendant filed the September 5th false report as a matter of calculated damage control after the events of

14

September 4th.   Less than 24 hours after chasing and shooting at a civilian vehicle off MDC property, the defendant filed the September 5th report – falsely positioning himself as a diligent correctional officer who properly detained suspects on MDC property and dutifully reported incidents to supervisors, such that he could not possibly have been the rogue correctional officer who broke myriad rules the night before.

Moreover, as one or more witnesses will testify, MDC-Brooklyn staff members readily identified the defendant as the perpetrator from video of the September 4th shooting after studying him in connection with his September 5th conduct.  As a result, the September 5 stop-and-frisk evidence is inextricably intertwined with the September 4th shooting because it explains how the defendant was identified as the perpetrator of September 4th shooting.

The September 5th evidence is also admissible pursuant to Rule 404(b).  First, as in Livoti, the fact that on both September 4th and September 5th the defendant used a BOP van to pursue a suspected contraband smuggler off MDC-Brooklyn property when he was not permitted to do so proves that he did not pursue the BMW on September 4th by mistake or accident.  Instead, the evidence will show that, on both days, the defendant purposely exceeded his legal authority and then tried to conceal his conduct.

The September 5 incident also constitutes powerful evidence that the defendant acted willfully on September 4th.  Indeed, the report the defendant made of the September 5th incident reveals that he was fully aware of his reporting obligations, and his decision to make a report about the September 5th incident—but not about the shooting on September 4th—demonstrates that the defendant knew that the shooting on September 4th was indefensible and something he needed to conceal.  Similarly, the fact that the defendant lied in the September 5th report about the location of the stop-and-frisk – falsely stating that it took place near the staff

parking lot – reveals that he understood he had no authority to act beyond MDC-Brooklyn's property line. This is classic consciousness-of-guilt evidence—proof that the defendant knew that his September 4th conduct broke the law and then took affirmative steps to hide it by presenting himself as rule-abiding. For all these reasons, the September 5th evidence provides crucial insight into the defendant's state of mind and establishes that his silence about September 4th was knowing concealment, not oversight.

Finally, like the evidence in <u>Livoti</u>, the probative value of admitting evidence of the September 5th incident substantially outweighs any prejudicial effect. The September 5th conduct—intercepting contraband off MDC-Brooklyn property and then lying about it afterwards—is far less inflammatory than the charged shooting, and any prejudicial impact can be mitigated by a limiting instruction to the jury.

II.    <u>The Court Should Admit the Victim's Statements to First Responders and Medical Providers, Which Do Not Constitute Hearsay or Fall Under a Well-Recognized Hearsay Exception</u>

At trial, the government intends to introduce the Victim's statements to first responders and medical providers treating his injuries, pursuant to Fed. R. Evid. 803(4) and 803(1)-(3). Specifically, the government seeks to admit the Victim's medical records as well as a video of him speaking in an ambulance before being escorted to the hospital. As explained below, the statements are admissible as statements for medical diagnosis and treatment under Rule 803(4), as excited utterances under Rule 803(2), and as present sense impressions and statements of then-existing physical condition under Rules 803(1) and (3), respectively.

A.    <u>Relevant Facts</u>

As described above, shortly after the defendant shot at the BMW on September 4, 2023, seriously injuring the Victim, the BMW crossed into Manhattan and came upon an ambulance treating an unrelated patient. The Victim flagged the ambulance down and informed

16

the emergency medical technicians ("EMTs") that he had been shot and could not breathe. The EMTs provided care to the Victim and ultimately took him to Bellevue hospital, where he was treated for his gunshot wound.

While in the ambulance, the Victim was captured on video telling one of the EMTs and a responding NYPD officer in substance and in part, "I can't breathe!" He continued, "I was in the car with my friend and they just started shooting." The Victim was in and out of consciousness as the EMT and the responding officer continued to ask him questions about where the shooting occurred. It is clear from the body worn camera that Victim-1 is in significant distress. In response to those questions, the Victim indicated that he was in the backseat of his friend's car, that another friend was driving her car, and that he was in Brooklyn when the shooting occurred.

B.    Applicable Law

1.    Rule 803(4): Statements for Medical Diagnosis or Treatment

Rule 803(4) permits admission of out-of-court statements that are made for and reasonably pertinent to medical diagnosis or treatment and describe a patient's "past or present symptoms or sensations," "their inception," or "general cause." Fed. R. Evid. 803(4). Rule 803(4) permits admission of a statement so long as it was relied upon by the doctor when considering how to treat the patient. United States v. Robert Hadden, No. 23-6822-CR, 2024 WL 4456203, at *3 (2d Cir. Oct. 10, 2024).

2.    Rule 803(2): Excited Utterances

The "excited utterance" exception to the hearsay rule permits admission of an out-of-court statement related to a startling event or condition, made while the declarant was under the stress of excitement that it caused. Fed. R. Evid. 803(2). The rationale is that "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

Notwithstanding their similar rationales, the "excited utterance" and "present sense impression" exceptions are not synonymous. While the "present sense impression" exception "focuses on contemporaneity as the guarantor of reliability and requires that the hearsay statement 'describe or explain' the contemporaneous event or condition, the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements—i.e. those that 'relate to' the event." United States v. Johnson, 117 F.4th 28, 46-47 (2d Cir. 2024) (quoting United States v. Jones, 299 F.3d 103, 112 n.3 (2d Cir. 2002)). Therefore, an excited utterance need not be contemporaneous with a startling event to be admissible. Indeed, it can be made hours after a traumatic event, so long as the stress of excitement persists. See id. (citing United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990) (approving admission of an excited utterance notwithstanding a lapse of "five or six hours" between the utterance and startling event)); Tocco, 135 F.3d at 127 (approving admission of an excited utterance that occurred three hours after the startling event); United States v. Watson and Ozy Media, Inc., No. 23 Cr. 82 (EK) 2024 WL 4455773, at *2 (E.D.N.Y. May 31, 2024) (admitting under Rule 803(2) an email sent sixteen hours after a startling event).

3.     Rule 803(1): Present Sense Impressions

Rule 803(1) permits admission of out-of-court statements "describing or explaining an event or condition made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). To qualify as a present sense impression, the proponent of the statement must satisfy three elements: (i) the declarant must have personally perceived the event described; (ii) the statement must describe the event; and (iii) the statement must be made with the event, or immediately thereafter. See United States v. Jones, 299 F.3d 103, 112-13 (2d Cir. 2002); see also United States v. Ibanez, 328 F. App'x 673, 675 (2d Cir. 2009) ("For statements to qualify as present sense impressions, precise contemporaneity is not required."). Present sense impressions are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." Jones, 299 F.3d at 112.

4.     Rule 803(3): Then-Existing State of Mind or Condition

The "state of mind" exception to the hearsay rule permits admission of a statement describing "the declarant's then-existing state of mind" or "emotion, sensory, or physical condition (such as mental feeling, pain, or bodily health)." Fed. R. Evid. 803(3). Like the "present sense impression" exception, the "reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation." United States v. Cardascia, 951 F. 2d 474, 487 (2d Cir. 1991). Rule 803(3) draws a distinction between a statement of a then-existing state of mind on the one hand, which is admissible, and statement regarding a past memory or belief, on the other, which is inadmissible. Id. at 488.

5.     Confrontation Clause

To be admissible, statements that fall within a hearsay exception must accord with the Confrontation Clause of the U.S. Constitution. The Confrontation Clause bars the admission of an out-of-court statement that falls within a hearsay exception where the statement is testimonial

and against a defendant in a criminal case. See Johnson, 2024 WL 4096459, at *11; Crawford v. Washington, 541 U.S. 36, 56 (2004). The Supreme Court has identified a "core class of testimonial statements" that includes "ex parte in court testimony or its functional equivalent"; "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Johnson, 2024 WL 4096459, at *12 (quoting Garlick v. Lee, 1 F.4th 122, 129 (2d Cir. 2021)). Testimonial statements also include "statements made in the course of police interrogation" when "the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution." Smith v. Arizona, 144 S. Ct. 1785, 1792 (2024) (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)). But "statements made to police to meet an ongoing emergency" that "were not procured with a primary purpose of creating an out-of-court substitute for trial testimony" are not testimonial. Id. (quoting Michigan v. Bryant, 562 U.S. 344, 358-59 (2011)). The Confrontation Clause "has no application to nontestimonial statements." Johnson, 2024 WL 4096459, at *12.

C.    Discussion

Here, the Victim's statements to first responders and to medical providers are admissible under Rule 803(4) because they were made for and in relation to medical diagnosis and treatment, and the medical providers relied on them in considering how to treat the victim and his injuries. The Victim's statements to the EMTs and responding NYPD officer in the ambulance are independently admissible as excited utterances under Rule 803(2), because the Victim suffered from an exciting event and the "stress of excitement" caused by the shooting had not dissipated at the time of his statements. See Scarpa, 913 F.2d at 1017 (approving admission of an excited utterance notwithstanding a lapse of "five or six hours" between the utterance and startling event);

20

<u>Tocco</u>, 135 F.3d at 127 (approving admission of an excited utterance that occurred three hours after the startling event).  Finally, all of the Victim's statements are also admissible as present sense impressions and descriptions of his then-existing emotional and physical condition under Rules 803(1) and (3), respectively.  <u>See</u> <u>United States v. Graham</u>, No. 14-CR-500 (NSR), 2015 WL 6161292, at *6-7 (S.D.N.Y. Oct. 20, 2015) (ruling admissible under Rules 803(1) and (3) victim's non-verbal responses to police officer's question at door of apartment whether she was at apartment willingly and whether she wanted to be there, and victim shook her head no, and ruling admissible under Rule 803(1) victim's statement to officer "[g]et me the fuck out of here, he's crazy").

The Confrontation Clause is no bar to any of these statements' admission because none are testimonial.  Statements made for purposes of receiving medical treatment are non-testimonial. <u>Garlick</u>, 1 F.4th at 129.  Likewise, statements which are excited utterances and/or present sense impressions are similarly non-testimonial in nature.  <u>See, e.g.</u>, <u>Branham v. Lee</u>, No. 10 Civ. 3074 (NRB), 2011 WL 5979530, at *6 (S.D.N.Y. Nov. 29, 2011) (collecting cases).  For these reasons, the Court should permit the government to introduce the Victim's statements to first responders and medical providers treating his injuries.

III.    <u>The Court Should Preclude the Defendant from Introducing His Own Out-of-Court Statements under Rule 802</u>

The Court should preclude the defendant from introducing any self-serving out-of-court statements through cross-examination of the government's witnesses or through defense exhibits.

A defendant's out-of-court statements are not hearsay when offered by the government.  Fed. R. Evid. 801(d)(2)(A) ("A statement is not hearsay if . . . [it] is offered against the party and is [] the party's own statement"); <u>see also</u> <u>United States v. Marin</u>, 669 F.2d 73, 84

(2d Cir. 1982) ("[U]nder Rule 801(d)(2)(A)," a defendant's statement offered by the government "is not hearsay, because it is simply a statement of the opposing party."). A defendant, however, is not permitted to offer his own out-of-court statements into evidence. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." Id. at 74; see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) (the defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted.").

Here, the defendant made several out-of-court statements about the events at issue in the Indictment. His cellular device contains multiple text messages, emails, and audio files falsely telling others that he acted in self-defense. That evidence is hearsay. If the defendant wants to claim self-defense, he must support that claim with competent, admissible evidence, not self-serving hearsay.

IV.  The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Would Result in Unfair Prejudice, Confusing the Issues, Misleading the Jury and Wasting Time

The Court should preclude evidence and arguments that are inadmissible under Rule 402 and otherwise barred by Rule 403.

First, while the government expects that there will be evidence at trial regarding contraband smuggling into the MDC-Brooklyn, including issues in the summer of 2023 around contraband smuggling through the MDC-Brooklyn's windows, it would not be proper for the defendant to introduce at trial excessive evidence or argument about broader contraband smuggling at trial. This includes evidence or argument around the types of contraband smuggled into MDC-Brooklyn, the different methods in which contraband is smuggled, how MDC-Brooklyn fares in preventing contraband smuggling as compared to other BOP institutions, and the BOP or

22

government's perceived shortcomings in stemming the flow of contraband smuggled into the MDC-Brooklyn.

Second and relatedly, the defendant should be precluded from introducing evidence or argument about the conditions at the MDC-Brooklyn, including working conditions and inmate violence. This includes any efforts by the defendant to put the government on trial for any of the MDC-Brooklyn's deficiencies, which would be plainly improper under the law.

Third, because the defendant did not know the identity of the MDC-Brooklyn inmate to whom the occupants of the BMW intended to smuggle contraband ("Inmate-2"), the defendant should be precluded from introducing evidence about him. This includes evidence of Inmate-2's criminal history, his affiliation with a street gang called Own Every Dollar ("OED"), and his disciplinary history at the MDC-Brooklyn, none of which was known to the defendant at the time he committed the charged conduct.

Fourth, the Court should preclude the defendant from introducing evidence of the defendant's prior commission of "good acts" or the non-commission of other bad acts.

Fifth, the Court should preclude the defendant from referencing at trial any consequences of his conviction.

A.    Applicable Law

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial. To be relevant, the evidence must be "a step on one evidentiary route to an ultimate fact." Old Chief v. United States, 519 U.S. 172, 178-79 (1997). Relevant evidence may still be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see United States v. Hsu, 669

23

F.3d 112, 119 (2d Cir. 2012) (noting that "[d]istrict courts have broad discretion to balance probative value against possible prejudice").

Applying Rule 403, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by unduly distracting their attention from the charged crimes through sympathy or other improper considerations.  See, e.g., United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming district court's exclusion of evidence because it "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case").  Courts in this district also regularly exclude evidence under Rule 403 that is designed to invite jury nullification.  See, e.g., United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *13 (E.D.N.Y. Dec. 12, 2017) (citing United States v. Rivera, No. 13-cr-149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015); United States v. Levin, No. 15-cr-101, 2016 WL 299031, at *10 (S.D.N.Y. Jan. 25, 2016); see also United States v. Chang, No. 18-CR-00681 (NGG) (CLP), 2024 WL 3303717, at *12 (E.D.N.Y. July 3, 2024).

A defendant is entitled to present a defense only if it has a foundation in the evidence, see United States v. Kwong, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, see United States v. Bakhtiari, 913 F.2d 1053, 1057 (2d Cir. 1990).  If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury.  See United States v. Paul, 110 F.3d 869, 871 (2d Cir. 1997) (citing United States v. Bailey, 444 U.S. 394, 416-17 (1980)).

B.    Discussion

1.    The Court Should Exclude Excessive Evidence or Argument Concerning Contraband Smuggling

At trial, the government expects that there will be evidence regarding contraband smuggling into the MDC-Brooklyn.  In addition to testimony specifically related to the defendant's

August 2023 conduct, the events leading up to the September 4, 2023 shooting, and the September 5th stop-and-frisk, the government expects that BOP witnesses and former MDC-Brooklyn inmates will acknowledge that contraband smuggling was an issue facing the institution. Because it anticipates eliciting such testimony, the government believes it is appropriate for the defendant to meet that evidence by questioning witnesses and eliciting testimony, within appropriate limits, on the subject.

However, the defendant should be precluded from introducing excessive evidence or argument on the subject of contraband smuggling at the MDC-Brooklyn. The defendant's state of mind can be established through targeted, specific evidence without extensive exploration of the MDC-Brooklyn's broader contraband challenges. The scope and frequency of contraband smuggling at the MDC-Brooklyn generally bears no direct relationship to whether the defendant's specific actions on September 4, 2023, violated federal law. The defendant's culpability depends on his conduct and intent, not on the severity of the institution's contraband problems.

Excessive evidence about contraband smuggling poses several substantial prejudicial risks. First, extensive evidence about the MDC-Brooklyn's contraband problems may improperly generate sympathy for the defendant by portraying him as a dedicated officer fighting an overwhelming problem. That sympathy is unrelated to the legal question facing the jury: whether his actions were lawful and constitutional. Next, excessive evidence on this issue would invite the jury to nullify the law by concluding that the defendant's illegal conduct was justified by the facility's problems. And it would improperly shift the jury's focus to the MDC-Brooklyn and government, putting them on trial, not the defendant.

The government recognizes that the Court will need to see how the evidence comes in at trial in order to determine what qualifies as "excessive" evidence. But the Court can set

appropriate guardrails at the outset of the trial.  For instance, the defendant should not be permitted to elicit testimony or introduce evidence about the frequency or volume of contraband smuggled into the institution, either on a standalone basis or compared to other BOP institutions in the country.  Nor should the defendant be permitted to introduce detailed testimony about contraband incidents unrelated to the defendant's case.  And the defendant should not be permitted to argue that contraband smuggling justifies lethal force (which is plainly wrong as a matter of law).

> 2.  The Court Should Preclude Evidence or Argument Concerning the MDC-Brooklyn's Working Conditions, Including Inmate Violence

Under Rules 402 and 403, the defendant should be precluded from introducing evidence or argument about working conditions at the MDC-Brooklyn, including understaffing, inmate violence, and other institutional challenges.

This evidence has no bearing on whether the defendant willfully violated the Victim's constitutional rights.  No staffing shortage compelled him to chase the BMW through Brooklyn streets.  To the opposite, short staffing should have compelled him to stay on his post.  No inmate violence threatened him while he fired at civilians fleeing to the Brooklyn Bridge.  These were deliberate choices that violated clear rules regardless of institutional conditions.  Workplace evidence does not go to any element of the charged offenses or any viable defense.  Section 242 requires proof of willful conduct under color of law—a standard focused on the defendant's intent and authority.  Section 924(c) requires proof that he discharged a firearm during a crime of violence.  General working conditions are irrelevant to both elements.

Evidence about understaffing and inmate violence poses several prejudicial risks.  It would risk influencing the jury's assessment of the defendant's criminal liability based on factors unrelated to his conduct, causing them to excuse his illegal conduct out of sympathy for his workplace challenges.  This risk is particularly dangerous where the evidence would cast the

government as responsible for creating or failing to address those conditions.  The defendant should not be permitted to blame-shift by falsely suggesting to the jury that poor management by BOP officials caused the defendant's criminal conduct.

Nor should he be allowed to use this evidence in a bid for jury nullification.  Jury nullification is not a right of the jury, and it is not permissible for a defendant to argue or introduce evidence for that purpose.  See United States v. Polouizzi, 564 F.3d 142, 162-63 (2d Cir. 2009) (noting that "it is not the proper role of courts to encourage nullification."); United States v. Thomas, 116 F.3d 606, 615 (2d Cir. 1997) (stating that "the power of juries to 'nullify' or exercise a power of lenity is just that—a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."); see also United States v. Funches, 135 F.3d 1405, 1408 (11th Cir. 1998) ("Juries sometimes assume the power of nullification; still, nullification is no *right* of the jury." (emphasis in original)); Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999) (citing affirmatively Thomas, 116 F.3d at 615).

Workplace evidence would also confuse the issues and cause delay.  As the Court well knows, the conditions at the MDC-Brooklyn are complex, with many perspectives, contributing factors, and explanations.  The Court should not permit the defendant to turn his trial into a referendum on the MDC-Brooklyn.  See United States v. Rushin, 844 F.3d 933, 941-42 (11th Cir. 2016) (affirming exclusion of evidence regarding poor working conditions and unrelated acts of inmate violence on relevance grounds and nullification grounds in prosecution against correctional officers who assaulted inmates and then covered up the assaults and finding that the excluded evidence had "little, if any, probative value or significance"); United States v. Boen, 19 Cr. 20037 (TLB) (W.D. Ark. July 27, 2021), Dkt. 62 at 7 (excluding evidence of prison conditions on defense motion, and on Government consent, with the exception of specific physical

27

characteristics of the facility as relevant to the alleged assault of the victims); see also United States v. Williams, 2:21 Cr. 160 (M.D. Ala. August 10, 2023) (RAH), Dkt. 191 at 2-3 (noting that evidence of "unrelated acts of violence, prison conditions in general, staffing levels in general, overcrowding" as "overly prejudicial, confusing, and not relevant to the issues in this matter" concerning a particular assault by officer and stating that "[t]he Court will not permit any reference to these subject matters without advance permission from the Court").   Any argument about general policies at the MDC-Brooklyn that impacted the defendant's working conditions would be improper.  The Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public policy considerations."  United States v. Chueng Kin Ping, 555 F.2d 1069, 1074 (2d Cir. 1977); see id. at 1073 (affirming instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government has proved the facts alleged in the indictment beyond a reasonable doubt"); see also United States v. Josephberg, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service [w]as 'arrogant,' . . . and that because of this, Defendant should be acquitted").

Here, allowing the defendant to argue about poor general working conditions at the MDC-Brooklyn would improperly turn the trial into a referendum on policies related to criminal justice including resource allocation. Cf. Abu Dhabi Comm. Bank v. Morgan Stanley & Co., No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis.").  It is the defendant, and not the MDC-Brooklyn or its management, who is responsible for the charged conduct. The defendant must not be permitted to misdirect the jury's focus to

irrelevant and inflammatory matters about conditions at the MDC-Brooklyn, since any probative value from such evidence is far outweighed by the risk of undue prejudice and jury nullification.

      3.    <u>The Court Should Exclude Evidence About the Background of the Other Occupants of the BMW and Inmate-2, Including Inmate-2's Criminal and Disciplinary History</u>

At trial, the government expects to elicit evidence that Inmate-2, who was in custody at the MDC-Brooklyn at the time of the September 4, 2023 shooting, is both known to the Victim and related to the BMW's owner, the female who was seated in the BMW's front-passenger seat during the shooting. The government also expects to elicit evidence that Inmate-2 was in contact with the occupants of the BMW as they were en route to the MDC-Brooklyn with contraband in the back of the vehicle. However, for the reasons set forth below, the defendant should be precluded from introducing evidence about Inmate-2's criminal history, gang affiliation, or MDC-Brooklyn disciplinary history.

At trial earlier this year in the Southern District of New York, Inmate-2 was convicted of racketeering conspiracy, murder in aid of racketeering, murder through the use of a firearm, and attempted murder and assault with a dangerous weapon, among other criminal offenses committed in connection with his leadership role in OED, a subset of the Trinitarios gang based in and around the Washington Heights area of Manhattan. Inmate-2 also stabbed another inmate at the MDC-Brooklyn.

Inmate-2's criminal background is not remotely relevant to the charged offenses. The defendant did not know that the occupants of the BMW intended to smuggle contraband to Inmate-2, much less that Inmate-2 was involved at all. Nor did he know what the occupants of the BMW looked like—the BMW was tinted—much less who they were. His decision to shoot was based solely on his apparent belief that the people in the BMW were up to no good. Because the defendant's state of mind could not have been influenced by information he did not have at the

time of the shooting, Inmate-2's background cannot make his conduct more or less lawful. It should therefore be excluded on relevance grounds.

Even if Inmate-2's criminal background were relevant (and it's not), it should also be excluded under Rule 403. Needless to say, Inmate-2's and gang affiliation and extensive criminal background are both highly prejudicial—far more inflammatory than the charged crimes. See, e.g., United States v. Jackson, No. 19-CR-356 (ARR), 2021 WL 62109, at *2 (E.D.N.Y. Jan. 7, 2021) (excluding evidence of defendant's affiliation with the Bloods gang, "which is notorious for its violence and criminality," because it was more inflammatory than the charged crime of being a felon in possession of a firearm) (internal citation and quotation marks omitted). Admitting such evidence would improperly suggest that the defendant's conduct was justified because the occupants of the BMW were associating with a bad person, and, as a result, were themselves "bad people," deserving of harsh treatment. That is prohibited character evidence under Rule 404(a)(1) and (b)(1).[4]

In short, Inmate-2's criminal background has nothing to do with the case. The Court should preclude all evidence of it.

4. The Court Should Preclude Evidence or Argument Concerning the Defendant's Prior Commission of "Good Acts" Or Non-Commission of Other Bad Acts

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990). This is because "evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." United States v. Baykoff, 67 F. App'x 15, 20-21 (2d Cir. 2003) (summary order). In other words, specific-act propensity evidence

_____

[4]    Notably, Rule 404(a)(2) is not applicable. Inmate-2's criminal background does not establish evidence of a pertinent trait of the Victim.

is no more admissible to refute a criminal charge than it is to establish one. See United States v. Dawkins, 999 F.3d 767, 792 (2d Cir. 2021) ("No less than evidence of a defendant's prior 'bad acts' used to show that he committed the crime charged, subject 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.,* if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit.").

Moreover, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait of character," or the witness's opinion of the defendant as regards to that trait, see Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. See, e.g., United States v. Benedetto, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); United States v. Rivera, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving); United States v. Fazio, No. S2 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), aff'd, 770 F.3d 160 (2d Cir. 2014). Nor can a defendant offer testimony about his reputation for traits that are not "pertinent." Fed. R. Evid. 405(a).

The defendant accordingly should be precluded from offering evidence or argument, including in his opening statement or his own testimony, concerning any instances during his employment in which he acted in accordance with the law or BOP policy. In particular, the defendant should be precluded from introducing evidence of occasions in which the defendant permissibly used force on an inmate, wrote an accurate incident report, or was the subject of an

31

allegation of physical abuse by an inmate that ultimately was unsubstantiated. Such evidence is not relevant to the charges in the Indictment and is therefore inadmissible. See, e.g., United States v. Dawkins, 999 F.3d at 792 (affirming this Court's refusal to allow defendant in bribery trial to introduce evidence of the defendant's relationship with coaches he did not bribe); United States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted as evidence that the defendant lacked fraudulent intent because it "was simply irrelevant to whether the applications charged as false statements were fraudulent").

Even if there is some marginal relevance of the defendant's "good acts" on other occasions, the evidence should be excluded under Rule 403. Such evidence would needlessly complicate and lengthen the trial, since it would introduce non-germane issues that the Government would then need to rebut. Introducing such evidence is also designed to improperly elicit juror sympathy and should be excluded.

5.    The Court Should Preclude Any Evidence or Argument Concerning Possible Punishment or Collateral Consequences

The Court should preclude the defendant from referencing at trial any consequences of his conviction. While the defense has not suggested that it intends to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of the possible punishments or collateral consequences of conviction.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant. Pursuant to Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible." See Fed. R. Evid. 402. "[T]he district

court has broad discretion to exclude evidence that is irrelevant . . . ." United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403. The defendant's punishment is not a fact "of consequence" to be determined at trial. Therefore, any evidence of those issues is not relevant. See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Evidence about possible punishment is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion." Id. Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt. See generally Sand, et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)).

Courts have routinely precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences."); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury"). In short, guilt should determine punishment, not the other way around. See Thomas, 116 F.3d at 614 ("Nullification is, by definition, a violation of a

33

juror's oath to apply the law as instructed by the court . . . .  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent.").  Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct."  Id. at 616.  Therefore, the Court should preclude the defendant from referencing potential punishment and collateral consequences at trial.[5]

V.     <u>The Defendant Should Be Ordered To Disclose Rule 16(b) Discovery, Including Experts He Intends to Call, Rule 26.2 Material, and Trial Exhibits To Be Introduced During the Government's Case</u>

A.     <u>Rule 16(b) Discovery and Trial Exhibits</u>

Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case.  In relevant part, the rule requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16.  As explained in <u>United States v. Hsia</u>, No. 98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law

---

[5]     If the defendant exercises his right to testify, the government should be permitted to cross-examine him regarding the potential consequences of conviction that he faces because, under those circumstances, it is relevant to the defendant's credibility as a witness.  See <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974) (discussing use of cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues . . . in the case at hand.  The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation omitted)).

> Dictionary 207 (7th ed. 1999). Defendant's cross-examination of
> government witnesses, and the evidence introduced during that
> cross-examination, certainly may be used to support her defense
> . . . . The cross-examination of these and other government
> witnesses therefore is properly seen as part of defendant's case-in-
> chief if it buttresses her theory of the case.

Id. The Hsia court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." Id. at *2 n.1.

Courts in this district have repeatedly held that the defense must produce in advance any "exhibit that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination of a government witness. United States v. Chen et al, No. 22-CR-158 (ENV), ECF No. 366 (Oct. 17, 2024) (directing defendants to disclose such material even if it was produced by the government in discovery); United States v. Smothers, 652 F. Supp. 3d 271, 290 (E.D.N.Y. 2023); see also United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant"); United States v. Laquan Warren, No. 22-CR-231 (DLI), ECF Order (Sept. 6, 2023). That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit. See Smothers, 652 F. Supp. 3d at 308 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody"). Numerous other district courts have interpreted Rule 16(b) similarly. See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits

they intend to use at trial during cross examination of a government witness other than for impeachment purposes."); United States v. Holden, No. 13-CR-444, 2015 WL 1514569, at *4 (D. Or. Mar. 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 2:12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same).

The government first requested reciprocal discovery from the defendant by letter dated December 3, 2024. Yet, to date, the defendant has not disclosed any document he intends to introduce at trial. Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendant to identify any exhibits he intends to introduce during the government's case or any defense case no later than October 6, 2025, which is two weeks prior to the start of the trial.

B.    Expert Notice

Rule 16 requires the defendant to, upon the government's request, provide a "written summary of any [expert] testimony that the defendant intends to use," and the summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). The purpose of Rule 16(b)'s disclosure requirements is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

To date, the defense has not noticed any expert witnesses. After the recent <u>Curcio</u> hearing, defense counsel indicated to the government that it was still considering whether to call any experts. "[O]ne of counsel's most basic discovery needs is to learn that an expert is expected to testify." <u>Id.</u> But the government and the Court cannot properly assess the admissibility of expert testimony—often a "complex" endeavor—"without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions." <u>United States v. Ulbricht</u>, 858 F.3d 71, 115 (2d Cir. 2017). The government first asked the defense to notice its experts on December 3, 2024. The government explicitly reiterated that request by later dated September 2, 2025. <u>See</u> Dkt. No. 30.

Accordingly, the government respectfully asks that the Court order the defense to notice any experts it intends to call by no later than September 25, 2025.

C.    <u>Rule 26.2 Material</u>

Rule 26.2(a) provides that defense counsel must produce to the government "any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Courts in this Circuit—including this Court—routinely order defendants to abide by their Rule 26.2 obligations. <u>See, e.g.</u>, <u>United States v. Lopez, et al.</u>, 15-CR-252 (PKC), Trial Tr. 5872 (ordering defense to produce summaries of anticipated witness testimony); <u>United States v. Watson</u>, 23-CR-82 (EK), Dkt. Ent. Apr. 12, 2024 (E.D.N.Y.) (ordering disclosure of Rule 26.2 material); <u>United States v. Javice</u>, No. 23 Cr. 251 (AKH), 2025 WL 278885, at *1 (S.D.N.Y. Jan. 23, 2025) (ordering the defense to produce "statements that fall within the scope of Rule 26.2, including notes taken by a witness's interviewer or materials shown to and adopted or approved by the witness, but excluding other attorney work product).

Here, the government produced § 3500 material on September 15, 2025—more than a month before trial—to afford the parties time to prepare and make appropriate motions. To

avoid any unfair advantage, the Court should order the defendant to produce Rule 26.2 material

by no later than October 15, 2025.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant

the government's motions in limine in their entirety.

Dated:     Brooklyn, New York
           September 22, 2025

JOSEPH NOCELLA, JR
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


By:     _____/s/_____
        Erin M. Reid
        Eric Silverberg
        Raffaela Belizaire
        Assistant United States Attorneys
        (718) 254-7000