UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

        - against -

                                         **MEMORANDUM & ORDER**

LEON WILSON,                               1:24-CR-0465 (PKC)

               Defendant.
--------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

On November 14, 2024, Defendant Leon Wilson was charged in a two-count indictment with: (1) depriving John Doe of his constitutional rights under color of law through the use of unreasonable force, in violation of 18 U.S.C. § 242 (Count One); and (2) using a firearm during a crime of violence, namely, the crime charged in Count One, in violation of 18 U.S.C. § 924(c) (Count Two).  (Indictment, Dkt. 13, ¶¶ 1–2.)  On October 28, 2025, at the conclusion of a six-day trial, a jury convicted Defendant on both counts.  Defendant now moves pursuant to Federal Rule of Criminal Procedure ("Rule") 29 to vacate the guilty verdicts on both counts, or, in the alternative, for a new trial pursuant to Rule 33.  (Def.'s Mot. to Set Aside Verdict, Mot. for a New Trial, Dkt. 73 (hereinafter "Def.'s Mot.").)  For the reasons set forth below, Defendant's motions are denied.

## BACKGROUND

### I.    Pre-Trial

By a sealed complaint dated September 26, 2024, Defendant Leon Wilson was charged with violating 18 U.S.C. § 242 ("Section 242") by depriving John Doe, later identified as Erick Encarnacion ("Encarnacion"), of his constitutional rights.  (*See* Compl., Dkt. 1; Trial Tr. 277–278 (identifying Encarnacion).)  The Complaint alleged that on September 4, 2023, Defendant, who was then a correctional officer at the Bureau of Prisons's Metropolitan Detention Center-Brooklyn

("MDC-Brooklyn"), engaged in a high-speed chase of a vehicle as it sped out of the MDC-Brooklyn staff parking lot, and then shot at the vehicle, striking Encarnacion, a civilian passenger in the vehicle, in the back and seriously injuring him (the "September 4 Shooting"). (*See id*. ¶¶ 3–7.) On November 14, 2024, a grand jury returned the two-count indictment charging Defendant with violating Section 242 and 18 U.S.C. § 924(c) ("Section 924(c)"), based on the September 4 Shooting. (Indictment, Dkt. 13.)

On September 22, 2025, prior to trial, the Government moved to admit other acts evidence pursuant to Federal Rule of Evidence Rule 404(b) ("Rule 404(b)"). (Gov't's Mot. *in Limine*, Dkt. 33.) The evidence concerned two categories of acts by Defendant that the Government argued were admissible under Rule 404(b) as probative of his state of mind, and, specifically, whether his actions during the September 4 Shooting were willful. (*Id.* at 5.) First, the Government sought to introduce evidence of three separate prior incidents between Defendant and an MDC-Brooklyn inmate, Dylan Carreras ("Carreras"), in August 2023, during which (1) Defendant told Carreras that he had seen a woman arrive at the MDC-Brooklyn whom Defendant suspected of smuggling contraband, and that if he saw her return to the MDC-Brooklyn, Carreras would "be going to an early funeral because [Defendant] would put a bullet in the woman's head," (*id.* at 6); (2) Defendant, while pointing to his gun, accused Carreras of concealing contraband, and when Carreras retorted that Defendant's gun only shot rubber bullets, Defendant pulled out his gun and cocked it, thereby ejecting a bullet, (*id.*); and (3) Defendant confronted Carreras and "violently threw" him up against a wall, yelling "I will fucking kill you," (*id.* at 7).[1] Second, the Government sought to introduce evidence of an incident that occurred on September 5, 2023, the day after the

---

[1] Carreras was identified in the Government's Motion only as "Inmate-1." (Gov't's Mot. *in Limine*, Dkt. 33, at 6.)

September 4 Shooting, in which Defendant executed a stop-and-frisk of an individual *off* of MDC-Brooklyn property, recovering contraband in the process, but filing a report that "falsely suggest[ed]" that the stop occurred *on* MDC-Brooklyn property, so as to make it appear that his actions were within his jurisdiction as a correctional officer. (*See id.* at 7–8.)

The Court ruled that the evidence of the first two incidents with Carreras, and the stop-and-frisk report, were admissible to show Defendant's state of mind, specifically, that Defendant had acted willfully during the September 4 Shooting. (10/09/2025 Oral Arg. Tr., Dkt. 81, at 18.) However, the Court precluded the Government from introducing evidence of the third incident with Carreras, during which Defendant had allegedly thrown Carreras against a wall and threatened to kill him. (*Id.*)

At the same time, the Government moved *in limine* to preclude "excessive evidence or argument on the subject of contraband smuggling at the MDC-Brooklyn." (Gov't's Mot. *in Limine*, Dkt. 33, at 25.) The Government acknowledged that "the Court w[ould] need to see how the evidence c[ame] in at trial in order to determine what qualifie[d] as 'excessive' evidence," but asked that the Court "set appropriate guardrails at the outset of the trial." (*Id.* at 25–26.) The Court did so, first noting that certain evidence of the "smuggling problem" at the MDC-Brooklyn would be revealed through the Government's own evidence, but also ruling that defense counsel could ask inmate witnesses about contraband being smuggled into, or possessed within, the facility. (10/09/2025 Oral Arg. Tr., Dkt. 81, at 40–41.) However, the Court also ruled that excessive focus on contraband smuggling would not be permitted, and that defense counsel was not to ask MDC-Brooklyn guards about "work conditions or about whether or not contraband smuggling is a big problem" at the facility. (*Id.*)

**II.     Trial**

Trial began on October 22, 2025 and concluded six days later on October 28, 2025.  (*See* Trial Tr. 275, 1464.)

**A.     The Government's Evidence[2]**

The Government's proof at trial established the following:

1.     Operating Policies for MDC-Brooklyn Correctional Officers

The MDC-Brooklyn is a federal facility located in Brooklyn, New York that houses more than 1,000 federal inmates, most of whom are pre-trial detainees awaiting trial or sentencing. (Trial Tr. 953–54.)  Defendant was employed in 2023 as one of approximately 100 correctional officers at the facility.  (*See id.* at 954.)  As a correctional officer at the MDC-Brooklyn, Defendant was bound by the policies and procedures issued by the Department of Justice ("DOJ"), the Bureau of Prisons ("BOP"), and the MDC-Brooklyn.  (*Id.* at 956, 967.)  These policies included limitations

---

[2] The following facts and history are presented in the light most favorable to the Government.  *See United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021).

on the use of lethal force,[3] arrest authority,[4] and use of firearms,[5] as well as certain "post orders" governing other aspects of officers' conduct while on duty at the MDC-Brooklyn.[6] Defendant received each of these sets of policies and/or was trained in their application. (*See* GX 335 (lethal force policy); Trial Tr. 904–13 (lethal force training); *id.* at 965–67 (arrest authority policy); *id.* at 929–30 (post orders).)

---

[3] The DOJ policy prohibiting the use of excessive force provides that "correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person." (GX 335-A at 2.) The policy further prohibits correctional officers from using deadly force "solely to prevent the escape of a fleeing suspect"; from using firearms "solely to disable moving vehicles"; and from discharging a firearm from a moving vehicle except in "exigent circumstances," in which case, the officer "must have an articulable reason for this use of deadly force." (*Id.*)

[4] BOP policy limits the authority of correctional officers to make arrests beyond BOP premises to only four types of crimes: (1) assault of an officer, (2) escape of a prisoner in custody, (3) instigating or assisting an escape, and (4) escape of a recalcitrant witness. (GX 307 at 20–21.) BOP policy does not authorize correctional officers to make arrests off BOP premises in response to contraband smuggling. During the trial, multiple current and former BOP employees testified that they understood that BOP employees are generally not authorized to pursue criminal suspects off of MDC-Brooklyn property outside of these limited circumstances. (*See* Trial Tr. 419, 829, 962–63, 994–95.)

[5] BOP policy limits correctional officers' use of firearms to situations where such use is deemed "necessary" for certain defined "[l]aw [e]nforcement purposes," which are to "[p]revent escapes"; "[p]revent [the] loss of life or serious physical injury"; "[p]rotect government property" when "the damage or loss of property would contribute directly to an escape, loss of life, or serious physical injury"; and "[m]aintain or restore control of a correctional institution." (GX 306 at 54.) In this context, "escape" refers to escaping prisoners, not escaping criminal suspects. (*See* Trial Tr. 980.)

[6] These policies include a guideline that MDC-Brooklyn personnel notify commanding officers of "unusual incidents," (GX 315 at 1; Trial Tr. 917–919), a prohibition on "leav[ing] [one's] post unless . . . properly relieved or instructed to do so," (GX 315 at 1; Trial Tr. 920), and a requirement that officers generate incident reports, (GX 315 at 8–9; Trial Tr. 921–22). Another policy is that correctional officers, who are equipped with BOP firearms, are not permitted to carry their own firearms while on duty, (Trial Tr. at 413–14, 924–25).

2.    Interactions with Inmate Dylan Carreras

As noted above, Defendant had two prior interactions with an MDC-Brooklyn inmate, Dylan Carreras, that were admitted and presented to the jury.  The first, which occurred in August 2023, just weeks before the September 4 Shooting, involved Defendant approaching Carreras and saying that he (Defendant) had seen a woman arrive by car to the MDC-Brooklyn and that "if she comes back again, . . . that little Spanish bitch will get shot in the head, and we'll be going to an early funeral."  (Trial Tr. 752, 754–56.)  The second, shortly after, involved Defendant again confronting Carreras, this time about contraband discovered in a garbage can.  (*Id.* at 757.)  Defendant mentioned his gun, prompting Carreras to respond that "the gun is real, but them bullets in that shit is fake.  And you ain't shooting nobody.  That shit fake."  (*Id*. at 757–58.)  Carreras testified that Defendant then "took the firearm out . . . [and] it was pointed towards the floor.  He cocked it back, and the bullet came out.  Picked the bullet back up and put it in his pocket."  (*Id*. at 758.) [7]

3.    The Events of September 4, 2023

The night of September 4, 2023, Defendant was assigned an outpost at the MDC-Brooklyn, (*see id.* at 841–43), where he was expected to patrol the area on foot, not in a vehicle, (*see id.* at 825–26, 847).  Nonetheless, Defendant was driving a BOP van that night while stationed at his post.  (*See id.* at 846–47.)

At approximately 4:30 a.m. that night, Defendant left his post without permission and drove the BOP van to a nearby subway station, where he was captured on MTA surveillance video refilling his MetroCard.  (*See* GX 707 at 4:30–13:00.)  While Defendant was away from his post at the MDC-Brooklyn, a civilian BMW pulled into the MDC-Brooklyn staff parking lot, backed

---

[7] These two interactions are referred to collectively hereinafter as the "Carreras Evidence."

into an executive staff member's spot, and idled in place for several minutes. (*See id.* at 15:00–15:45.) Three individuals were in the BMW—the unidentified driver; the front passenger, Kaylyn Nunez; and Encarnacion, who was in the back seat. (Trial Tr. at 491–93.) They had come to the MDC-Brooklyn to smuggle contraband (drugs and cell phones) into the facility. (*See id.* at 485, 499–501, 540.) Encarnacion testified at trial that neither he nor the other passenger, Nunez, possessed guns that night, and that at no point in the evening did he see the driver possess a gun. (*Id.* at 492–94, 538.)

When Defendant returned to the MDC-Brooklyn from the subway station, he parked across the street from the staff parking lot where the BMW was still idling. (GX 707 at 15:15–16:10.) Ezequiel Santiago ("Santiago"), an MDC-Brooklyn senior officer, (Trial Tr. 367–68), was parked in the staff parking lot at the same time, just a few feet away from the BMW, (*id.* at 395, 420.) Santiago testified that he never saw anyone enter or exit the BMW, nor were the occupants of the BMW visible, because the windows were tinted. (*Id.* at 407–09.) He further testified that he never witnessed a rope or any other object descending from the facility to the BMW, (*id.* at 409), as one might expect if the BMW was facilitating the escape of a prisoner.[8] After a few minutes of being parked across the street, Defendant drove into the staff parking lot and pulled up immediately adjacent to the BMW, at which point the BMW immediately sped out of the parking lot. (GX 707 at 19:15–19:45.) Defendant proceeded to chase the BMW as both vehicles left the MDC-Brooklyn. (*Id.* at 19:45–19:48.) Multiple MDC-Brooklyn officers testified that Defendant had no authority to chase the vehicle under those circumstances. (*See* Trial Tr. 419, 829, 994–95.)

---

[8] Similarly, no rope descending to the BMW is visible in the surveillance footage. (*See* GX 707 at 15:40–19:40.)

Defendant chased the BMW for several minutes, as far as nearly three miles from the MDC-Brooklyn.  (GX 707 at 20:00–24:30; Trial Tr. 738–39.)  During the chase, Defendant exceeded the speed limit by at least 30 MPH, ran red lights, and swerved around cars and electronic scooters.  (*See* Trial Tr. 565; GX 707 at 20:00–24:30.)  At one point during the chase, nearly a mile away from the MDC-Brooklyn, on a multi-lane street, Defendant fired at least three, and possibly more than six, bullets at the BMW.  (*See* GX 707 at 21:20–21:35; Trial Tr. 448–49 (audio of at least three gunshots, in reference to GX 504-D); GX 3 (depicting two bullet holes in the rear of the BMW); GX 7 (depicting four additional bullet holes in the back right passenger side of the BMW).)  One of the bullets penetrated the BMW's exterior and struck Encarnacion in the back, causing "life threatening" injuries that he survived only after undergoing emergency surgery.  (Trial Tr. 640.)  Even after firing shots at the BMW, Defendant continued the chase.  (GX 707 at 21:27–22:45.)  At no point did Defendant call for backup or otherwise report the incident as it was happening.  (*See* Trial Tr. 738–39; 932–33.)

Defendant continued the high-speed chase up until the vehicles reached the Brooklyn Bridge, at which point the BMW fled into Manhattan, and Defendant turned back toward the MDC-Brooklyn.  (GX 707 at 24:33–45.)  Defendant drove back to the facility, returning roughly 30 minutes after he had originally left his post to travel to the subway station, and not having contacted any other officers or otherwise alerting them to the circumstances.  (*See id.* at 32:15; Trial Tr. 1138–39.)  Santiago testified that, despite Defendant normally having a "serious" demeanor, "[w]hen . . . [Defendant] returned, he returned happy" and seemingly feeling "accomplished."  (Trial Tr. 415, 417.)  Santiago further testified that, upon his return to the parking lot, Defendant told Santiago, essentially, that Defendant thought he had done a "good job," and

8

that "no one is going to introduce contraband in the institution, you know, we're not going to allow that." (*Id.* at 416.)

Defendant never reported the incident from that evening to anyone at the MDC-Brooklyn, (*see id.* at 984), and officials at the facility only learned of it after the New York City Police Department ("NYPD"), in response to Encarnacion being hospitalized, traced the license plate on the van to the BOP, which spurred an investigation, (*see id.* at 839–40, 985). As part of the investigation, the MDC-Brooklyn Warden ordered the preservation of all potentially relevant evidence. (*See id.* at 985.) That evidence included the firearms possessed by officers on duty the night of September 4, 2023, though subsequent examination of those firearms did not show any missing ammunition. (*Id.* at 985–86.) Also, examination by the MDC-Brooklyn armorer of the firearms assigned to the officers on duty the night of the September 4 Shooting showed that none of them had been fired recently. (*See id.* at 1191, 1196–98.)

4.     Defendant's False Report from September 5, 2023

On September 5, 2023, the night after the September 4 Shooting, Defendant was assigned to an MDC-Brooklyn outpost and was driving a BOP vehicle. (*See* Trial Tr. 815, 825–26.) While on post, Defendant observed a pedestrian off of MDC-Brooklyn property. Defendant pursued the man in a vehicle and eventually stopped-and-frisked, recovering contraband from him. (*See id.* at 824–26; GX 700.) Defendant then prepared and filed a report on the incident in which he suggested that he had recovered the contraband from the man while on MDC-Brooklyn property, near the staff parking lot. (*See* GX 336.) An investigative officer at the MDC-Brooklyn was assigned to investigate the incident, however, and concluded that the stop had in fact not occurred on MDC-Brooklyn property (and was thus unauthorized) and that Defendant's incident report was false in that respect. (*See* Trial Tr. 829.)

## B.        Defendant's Testimony

Defendant testified in his own defense, offering testimony that largely contradicted the physical evidence and witness testimony that the Government had put forward.

On direct examination, Defendant testified that he had observed multiple occupants in the BMW while it was idling in the parking lot, despite his being parked across the street and the BMW's windows being tinted.  (Trial Tr. 1054–55.)  He also testified to observing a "thin" rope stretching from the second story of the MDC-Brooklyn to the BMW, which led him to conclude that an escape was occurring.  (*Id.* at 1055.)  He further testified that, during his pursuit of the BMW, he was able to pull up alongside it when it was blocked by another car, and that he observed four occupants in the car.[9]  (*Id.* at 1059–60.)  According to Defendant, later in the chase, the BMW deliberately slowed down and a gun emerged from the rear driver's side window of the car.  (*Id.* at 1061–62.)  Defendant reacted by "immediately" dropping his cell phone, transferring his service weapon to his left hand, and firing at the BMW, "pulling from left to right."  (*Id.* at 1062 (describing his action as "engag[ing] a threat").)  After firing at the BMW, Defendant went into "shock" and began to "just driv[e]," rather than continuing to follow the BMW.  (*Id.* at 1063.)[10]

## C.        The Charge Conference and Summations

On September 29, 2025, weeks before the trial began, the parties submitted their proposed jury instructions.  (*See* Dkts. 36, 38.)

---

[9] Surveillance footage of the car chase does not reveal such an encounter.  (*See generally* GX 707.)  Furthermore, Defendant later sent a voice note to a friend in which he stated, "I didn't even know how many motherfuckers was in that car.  It could have been motherfucking two.  It could have been three.  I don't fucking know."  (GX 829 at 0:35–44.)

[10] During cross-examination, the Government elicited testimony that revealed a number of inconsistencies within Defendant's account of the relevant events.  (*See* Gov't's Resp. to Mot. for a New Trial, Mot. to Set Aside Verdict, Dkt. 77, at 15–17.)

### 1.    Justification Jury Instruction

Although neither side proposed a justification instruction before trial, they each submitted one during trial at the Court's direction.  (*See* Trial Tr. at 1001; Dkts. 47, 48, 49.)  Defendant proposed a justification instruction drawing on New York State Penal Law § 35.30, (Dkt. 48), which permits "peace officers" and police officers to use deadly physical force in certain circumstances beyond mere self-defense, including where reasonably necessary to effect an arrest of an escapee, *see* N.Y. Penal Law § 35.30.  The Government, on the other hand, proposed that the Court employ an instruction based on New York State Penal Law § 35.15(2), (Dkt. 49), which essentially entitles individuals to use deadly physical force only in self-defense, *see* N.Y. Penal Law § 35.15(2).

The Court heard argument from both parties, during which there was significant disagreement as to whether there was a reasonable view of the evidence in the light most favorable to Defendant that (1) he was a "peace officer" and (2) his actions were taken to prevent an escape. (*See* Trial Tr. 1208–93.)  During argument, the Court indicated that it agreed with the Government on both questions: there was no reasonable view of the evidence that Defendant was a "peace officer" or that he was attempting to prevent an escape, and thus an instruction as to New York State Penal Law § 35.30 would not be appropriate.  (*Id.* at 1272–73.)  Nonetheless, at Defendant's request, (*see id.* at 1269–70), the Court left it to the jury to decide both questions and provided the jury with both justification charges, (*see id.* at 1278–79).  This permitted the jury to find that Defendant was justified in his actions under either theory—as a "peace officer" making an arrest to prevent an escape or in self-defense.  (*See id.*)

### 2.    Uncalled Witnesses Equally Available Jury Instruction

During the charge conference, Defendant objected to the proposed inclusion of an "Uncalled Witnesses Equally Unavailable" instruction.  Defendant's objection was that one of the

11

occupants of the BMW, Kaylyn Nunez, was not equally available because the defense could not provide her with immunity.  (Trial Tr. 1226–27.)  The Government disagreed, contending that Defendant's decision not to call her as a witness was a "tactical" one.  (*Id.* at 1230.)  The Court overruled Defendant's objection given that she was available to him and he made no effort to call her as a witness.  (*Id.* at 1234–35.)  The Court went on to caution the parties to be careful about what they argued in summations so as not to create a "changed circumstance" requiring the Court to "address" improper arguments.  (*Id.* at 1237–38.)

Notwithstanding the Court's warning, during summations, defense counsel improperly argued that the jury should question why Nunez was not called as a witness.  (Trial Tr. 1365.)  Defense counsel also argued that the jury should doubt MDC-Brooklyn inmate Carreras's credibility because the Government did not produce surveillance footage of the events Carreras described during his testimony.  (*See id.* at 1352, 1365.)  After summations, without the jury present, the Court addressed the parties and explained that, in light of the defense's arguments, the Court would need to add two sentences to the jury instructions, which would say that "you heard argument about . . . how other evidence had to exist, such as surveillance video, but was not introduced at this trial," and that "[y]ou are not to speculate about whether any such evidence exists or what it might have shown."  (*Id.* at 1385–86.)  Defendant objected that this was unnecessary, but the Court explained that the improper arguments during summations had necessitated the additional two sentences in the instructions.  (*Id.* at 1386–88.)

### D.    Jury Deliberations

The jury was charged on October 28, 2025.  After deliberating for less than three hours, (*see id.* at 1438, 1461), the jury returned guilty verdicts on both counts, (*id.* at 1461–62).

### III.    Post-Trial Procedural History

On February 9, 2026, Defendant filed this motion to set aside the verdict under Rule 29, or in the alternative, for a new trial under Rule 33.  (*See* Def.'s Mot., Dkt. 73.)[11]  The Government responded on March 16, 2026, (*see* Gov't's Resp. to Mot. for a New Trial, Mot. to Set Aside Verdict, Dkt. 77 (hereinafter "Gov't's Opp'n")), and Defendant submitted a reply brief on April 15, 2026, (*see* Def.'s Reply, Dkt. 80 (hereinafter "Def.'s Reply")).  Defendant's Rule 29 and Rule 33 motions are now ripe for decision.

### DISCUSSION

Given the different legal standards and scope of evidence the Court can consider with respect to Defendant's Rule 29 and Rule 33 motions, the Court evaluates them separately, starting with the Rule 29 motion.  *See United States v. Landesman*, 17 F.4th 298, 319, 331 (2d Cir. 2021) (noting the different standards and evidentiary scopes for Rule 29 and Rule 33 motions).

### I.    Rule 29

#### A.    Legal Standard

Under Rule 29, "a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)).  "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *Coplan*, 703 F.3d at 62).  "[I]n evaluating a sufficiency challenge, [courts] 'must view the evidence in the light most favorable to the government, crediting every inference that could

---

[11] Defendant also orally moved for a Rule 29 acquittal at the close of the Government's case, which the Court denied on the record.  (Trial Tr. at 1002–03.)

13

have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Martoma*, 894 F.3d at 72).  Courts "will uphold the judgment[] of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Martoma*, 894 F.3d at 72 (alteration in original) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  That is, "[a] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013)).  "Moreover, 'the evidence must be viewed in its totality, "as each fact may gain color from others."'" *Landesman*, 17 F.4th at 319 (quoting *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005)).  Where "'a fact to be proved is also an element of the offense,' then 'it is not enough that the inferences in the government's favor are permissible,' but rather '[w]e must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element . . . is established beyond a reasonable doubt.'" *United States v. Varanese*, 417 F. App'x 52, 53 (2d Cir. 2011) (alteration in original) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

When a defendant moves for acquittal after the jury convicts, the court considers all evidence presented at trial, including the defense case. *See United States v. Crozier*, 640 F. App'x 100, 102–03 (2d Cir. 2016) ("[T]o the extent [the defendant] argues insufficient evidence to challenge the denial of his [Rule] 29 motion, he waived this argument by thereafter presenting a defense and, accordingly, we evaluate his sufficiency challenge based on the entire record.  In particular, because [the defendant] testified in his own defense at trial, the jury was entitled to disbelieve him and to 'use its disbelief to supplement the other evidence against him.'" (first citing

*United States v. Velasquez*, 271 F.3d 364, 372 (2d Cir. 2001); then quoting *United States v. Stanley*, 928 F.2d 575, 577 (2d Cir. 1991))).

      **B.**       **Defendant's Arguments for Acquittal**

In moving to vacate the jury's guilty verdicts, Defendant argues that: (1) the evidence of willfulness was insufficient to convict him of the Section 242 crime charged in Count One; (2) if the Court enters a judgment of acquittal as to Count One, Count Two must be vacated; and (3) Section 242's dangerous-weapon clause does not categorically qualify as a "crime of violence" under Section 924(c)(3)(A) and Count Two must thus be vacated as a matter of law. (Def.'s Mot., Dkt. 73, at 16–20.) For the reasons stated below, each of Defendant's arguments are unavailing, and the Court denies Defendant's Rule 29 motion for a judgment of acquittal.

      1.       <u>The Evidence Was Sufficient to Show That Defendant Acted Willfully</u>

Defendant's Rule 29 motion first argues that the Government failed to offer sufficient evidence that Defendant's conduct was willful. (Def.'s Mot., Dkt. 73, at 16–19.) Section 242 applies to "willful[]" conduct, which requires proof that the defendant acted with the specific intent "to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Screws v. United States*, 325 U.S. 91, 104 (1945). A "willful" act is one committed either "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Id.* at 105. "In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137, (1994)).

A fact finder can infer a defendant's willfulness from a range of circumstantial evidence. *See United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) ("Willfulness may be inferred from

15

circumstantial evidence. . . . [and] [t]he [Supreme] Court has not set limitations to the type of conduct from which willfulness can be inferred.").  "The law . . . does not require direct evidence to prove mens rea elements such as knowledge and intent, and repeatedly recognizes that they can be proved through circumstantial evidence and the reasonable inferences that such evidence allows."  *Varanese*, 417 F. App'x at 54 (citing *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005); *Ratzlaf*, 510 U.S. at 149 n.19).

Here, at trial, the Government offered five categories of proof through which the jury could have inferred Defendant's willfulness.  First, Defendant engaged in "plainly" wrongful conduct on September 4, 2023 by leaving his post at the MDC-Brooklyn and participating in a high-speed chase through the streets of Brooklyn that lasted over a minute, during which time he shot at the speeding car ahead of him at least three, if not six, times in the presence of civilians.  *See* (Gov't's Opp'n, Dkt. 77, at 41–42); *United States v. Bradley*, 196 F.3d 762, 769 (7th Cir. 1999) (finding that shooting at fleeing motorist to stop flight, absent a showing of life-threatening conduct by suspect, was "clearly unreasonable and excessive," and provided "ample evidence to reasonably conclude" that the defendant acted willfully under Section 242).  Second, Defendant's conduct that night was consistently contrary to his training and responsibilities, such as exceeding limits on the use of lethal force, attempting warrantless arrests beyond MDC-Brooklyn property, and failing to abide by his reporting obligations regarding "unusual incidents" and use of his firearm. (*See* Gov't's Opp'n, Dkt. 77, at 42); *see also United States v. Rodella*, 804 F.3d 1317, 1338 (10th Cir. 2015) (finding evidence of actions that violated protocol related to pursuit of vehicles to be relevant to establishing willfulness under Section 242); *United States v. Proano*, 912 F.3d 431, 444–45 (7th Cir. 2019) (finding sufficient evidence of willfulness based on the defendant's "brazenness" and disregard for his law enforcement training in firing at a car during a chase).

16

Third, Defendant took multiple steps to conceal his conduct after the fact by not reporting the incident, apparently "obscur[ing] which gun he used to commit the crime," and filing a false report regarding his recovery of contraband from the night after the shooting. *See* (Gov't's Opp'n. Dkt. 77, at 42–43); *see also United States v. House*, 684 F.3d 1173, 1202 (11th Cir. 2012) (relying on "efforts to prevent [defendant's] superiors' detection of [defendant's] actions" through false reports to support a finding of willfulness); *cf. United States v. Zheng*, 113 F.4th 280, 296 n.5 (2d Cir. 2024) (finding sufficient evidence of willfulness, relying primarily on evidence showing extensive efforts to conceal conduct, and noting that "[a] jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct" (citing *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008))).  Fourth, Defendant's prior interactions with Carreras, in which Defendant demonstrated an intention to use lethal force to combat contraband smuggling, allowed the jury to infer that Defendant's unauthorized use of lethal force just weeks later in attempting to prevent contraband smuggling was intentional and not an attempt at self-defense.  (*See* Gov't's Opp'n, Dkt. 77, at 25–28.)  Fifth, and finally, Defendant's atypical expressions of happiness, pride, and accomplishment upon returning from the shooting suggested that he had acted intentionally, as well as consistently with his desire to use lethal force to combat contraband smuggling.  (*See* Trial Tr. 415–17.)

Defendant's arguments to the contrary are without merit.  He argues that his purportedly "genuine[] belie[f] [that] he was preventing an escape and acting within [his] authority" means that he necessarily "lacked the specific intent to violate constitutional rights."  (Def.'s Mot., Dkt. 73, at 18.)  But there was no evidence aside from Defendant's own testimony—which the jury was free, and had ample basis, to reject—to support the existence of such a subjective belief.  Defendant's remaining arguments, (*id.* at 18–19), amount to attempts to suggest that each form of

17

proof of willfulness the Government offered was insufficient. He points to case law for the proposition that evidence of post-hoc concealment may be probative of willfulness but "may not, standing alone, support a conviction if the other evidence is insufficient." (*Id.* at 18 (quoting *United States v. Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995))). While this principle is certainly correct, it does nothing to undermine the sufficiency of the other evidence that was placed before the jury. Defendant similarly argues the evidence was insufficient because "training evidence proves policy awareness, not constitutional knowledge." (*Id.* at 19.) But here too Defendant fails to appreciate that the training evidence existed amongst other circumstantial evidence.[12] Even if some of the Government's proof regarding willfulness was insufficient standing alone, the Court finds that the totality of this proof, which was varied and voluminous, was more than ample for the jury to find that Defendant acted willfully on September 4, 2023 when he chased and shot at the BMW, seriously injuring Encarnacion. In light of the testimony and documentary evidence presented by the Government, the Court finds that there was more than sufficient evidence from which the jury could conclude that Defendant acted willfully in violating the victim's constitutional rights, and that therefore Defendant's conviction on Count One of the Indictment stands.

---

[12] To the extent Defendant's argument is that the "training evidence shows at most that [he] had notice of best practices," and does not show "that he had the specific intent to deprive someone of a federal right," (Def.'s Mot., Dkt. 73, at 18), he overstates what the Government must prove. "Proof of a specific intent on the part of . . . police officers to deprive persons of federal rights, rather than to engage in conduct having the effect of such deprivation, [is] unnecessary." *United States v. McClean*, 528 F.2d 1250, 1255 (2d Cir. 1976). The fact that Defendant "may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." *Screws*, 325 U.S. at 106; *see also United States v. Walsh*, 194 F.3d 37, 52 (2d Cir. 1999) (finding that the jury was properly instructed because the jury was not required to find "that the defendant acted with knowledge of the particular provision of the Constitution at issue," only that "the defendant intended to invade an interest protected by the Constitution" (citation modified) (citing *Screws*, 325 U.S. at 103, 106)).

### 2.   Count Two is Not Vacated Since Count One Stands

Defendant argues that because the Section 242 excessive force charge in Count One is the predicate offense for the Section 924(c) firearm offense charged in Count Two, a judgment of acquittal on Count One would require the vacatur of his conviction on Count Two.  (Def.'s Mot., Dkt. 73, at 20.)  Given the Court's denial of Defendant's Rule 29 motion as to Count One, this argument is moot.

### 3.   Violations of Section 242 with a Dangerous Weapon Categorically Qualify as a "Crime of Violence"

Defendant's final Rule 29 argument is that his conviction under Section 924(c) in Count Two must be vacated because "[Section] 242, when charged with a dangerous-weapon enhancement, does not categorically qualify as a 'crime of violence' under [Section] 924(c)(3)(A)'s elements clause."  (*Id.*)  More specifically, Defendant argues that his conviction for the purported predicate offense—deprivation of rights under color of law involving the use of a dangerous weapon under Section 242—is not in all circumstances a "crime of violence" and thus, under the "categorical approach," cannot serve as the predicate offense for a Section 924(c) charge.[13]  (*Id.*)  While neither party seems to think that the Court should address this argument on the merits,[14] the Court does so out of an abundance of caution and finds that Defendant's argument is unpersuasive.

---

[13] If successful, this argument would justify acquittal only as to Count Two, and would not implicate the validity of Defendant's Section 242 conviction in Count One.

[14] The Government argues that this argument is untimely, *i.e.,* "[t]o the extent the defendant asserts that the [Section] 924(c) charge should have been dismissed, that motion should have been raised pre-trial." (Gov't's Opp'n, Dkt. 77, at 43.)  And Defendant seems to concede that this issue should be resolved by the Court of Appeals, and not this Court, and that Defendant is merely "preserving" the issue for appeal. (*See* Def.'s Mot., Dkt. 73, at 20 ("Mr. Wilson preserves the argument that [Section] 242, when charged with a dangerous-weapon enhancement, does not categorically qualify as a 'crime of violence' under [Section] 924(c)(3)(A)'s elements clause. . . . No Second Circuit decision resolves this issue.  Mr. Wilson preserves it for appellate

Section 924(c)(1)(A) provides, in relevant part, that:

[A]ny person who, during and in relation to any crime of violence . . . (including a crime of violence . . . that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

    (i) be sentenced to a term of imprisonment of not less than 5 years;

    (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

As relevant here, Section 924(c)(3)(A) defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."[15]

---

review and respectfully submits it warrants relief.").)  However, the Court has the authority to resolve this issue, *see United States v. Davila*, 461 F.3d 298, 308 (2d Cir. 2006) (finding that a defendant had not waived such an argument by raising it only after trial since "Rule 12(b)(3)(B) . . . state[s] that 'at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense.'  An argument that an indictment fails to allege an element of the crime falls into the latter category" (citations omitted)), and it is not obvious to the Court that Defendant's claim is untimely, given that, as described below, part of the "modified categorical" analysis that the Court might apply can depend in part on jury instructions, and possibly even the jury verdict form, *see Mathis v. United States*, 579 U.S. 500, 518–19 (2016) (dictating that one tool in the "modified categorical" analysis is "the record of a prior conviction," which includes evidence such as the jury instructions); *Colotti v. United States*, 71 F.4th 102, 108 (2d Cir. 2023) (explaining that the Second Circuit, in applying a modified categorical approach, "consult[s] a limited set of documents—including the indictment, verdict form, and jury instructions—to determine which of the alternative branches of the statute's prohibitions was the basis of the defendant's conviction").  The Court therefore chooses to address Defendant's Section 924(c) argument on the merits, and assumes, without deciding, that it is timely.

[15] The Court need not consider the alternative definition under Section 924(c)(3)(B), the so-called "residual clause," as the Supreme Court has held that it is unconstitutionally vague.  *See*

The Supreme Court established the "categorical approach" in *Taylor v. United States*, in which it explained that determining whether a conviction can serve as a predicate offense for Section 924's sentencing enhancements requires "the trial court to look only to the fact of conviction and the statutory definition of the prior offense," "not to the particular facts underlying the . . . conviction[]." 495 U.S. 575, 600, 602 (1990).  Under the "categorical approach," unless every possible conviction for the underlying offense that a defendant might  have been convicted of qualifies as a predicate offense for the sentencing enhancement, then it is an invalid predicate. *See Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013) (courts "must presume that the conviction 'rested upon [nothing] more than the *least* of th[e] acts' criminalized, and then determine whether even those acts are encompassed" (alteration in original) (emphasis added) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010)).  To make this assessment, courts (1) identify the relevant definition of predicate offenses that qualify under the enhancement, (2) identify the elements of the prior conviction serving as the predicate offense, and (3) compare the elements of the prior conviction to the definition.  *See United States v. Jordan*, No. 19-3032-CR, 2024 WL 445000, at *1 (2d Cir. Feb. 6, 2024) (summary order) (citing *United States v. Pastore*, 83 F.4th 113, 118, 119 (2d Cir. 2023); *United States v. Morris*, 61 F.4th 311, 318–19 (2d Cir. 2023); *Shepard v. United States*, 544 U.S. 13, 16 (2005)).

Here, step one is simple: Section 924(c)(3)(A) defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."

---

*United States v. Davis*, 588 U.S. 445, 470 (2019).  Defendant's conviction must necessarily rest on Section 924(c)(3)(A), the so-called "elements clause."

21

The second step, identifying the elements of the prior conviction, requires more attention. When identifying the elements of the prior conviction, courts must be conscious that some statutes "have a more complicated (sometimes called 'divisible') structure, making the comparison of elements harder." *Mathis v. United States*, 579 U.S. 500, 505 (2016). As the Second Circuit recently explained:

> A statute is *divisible* if it 'lists elements in the alternative, and, in doing so, creates a separate crime associated with each alternative element.' A statute is *indivisible* if it 'creates only a single crime' even though 'it may "spell out various factual ways," or "means," "of committing some component of the offense."' When a statute spells out alternative factual means, the jury 'need not agree on the particular means by which the defendant committed the crime' in order to convict.

*United States v. Ross*, No. 25-210-CR, --- F.4th ---, 2026 WL 1500955, at *2 (2d Cir. May 29, 2026) (quoting *Harbin v. Sessions*, 860 F.3d 58, 64 (2d Cir. 2017)). "Divisible statutes are analyzed under a modified categorical approach, which allows examination of 'a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements[,]' underlies the defendant's predicate conviction." *Id.* (quoting *Mathis*, 579 U.S. at 505). So, the question is whether Section 242 is "divisible."

The case law is generally in agreement that Section 242 is divisible into at least three alternative offenses.[16] In *Rodella*, the Tenth Circuit "broke[] apart for clarity" the "three clauses of [Section] 242" as follows:

> [First Clause] Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth,

---

[16] As set forth below, Section 242 has three clauses separated by semicolons and prescribes escalating maximum punishments (misdemeanor, ten-year felony, and capital felony), so it is generally understood that the statute is divisible by at least these three offenses. *See, e.g.*, *United States v. Williams*, 343 F.3d 423, 434 (5th Cir. 2003) (explaining why each clause is a separate offense); *United States v. McInerney*, No. 18-CV-20584, 2020 WL 3868499, at *4 (E.D. Mich. July 9, 2020) (noting that the parties agreed Section 242 was divisible by at least three offenses, but disagreed as to further divisibility).

Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both;

[Second Clause] and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both;

[Third Clause] and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

852 F. App'x 323, 328 n.5 (10th Cir. 2021) (unpublished decision) (alterations in original) (quoting

18 U.S.C. § 242).

But the disagreement that arises in this case and others pertains to whether the second

clause is further divisible into alternative offenses:

[I]f bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, [the defendant] shall be fined under this title or imprisoned not more than ten years, or both[.]

18 U.S.C. § 242. As the Defendant points out, (Def.'s Reply, Dkt. 80, at 1–2), the second clause

can be violated where "bodily injury results," *id.*, despite the absence of "the use, attempted use,

or threatened use of physical force against the person or property of another,"

18 U.S.C. § 924(c)(3)(A). [17]  But "*violent* force—that is force capable of causing physical pain or

injury to another person'—is required for a statute to meet [Section] 924(c)(3)(A)'s 'physical

---

[17] As an example, Defendant notes the potential for bodily injury to result from the willful denial of medical care, which could occur without the use or threat of force. (Def.'s Reply, Dkt. 80, at 1–2.)

force' requirement." *See United States v. Rodella*, 435 F. Supp. 3d 1222, 1251 (D.N.M. 2020) (quoting *Johnson*, 559 U.S. at 140), *aff'd*, 852 F. App'x 323 (10th Cir. 2021).  Therefore, if the entire clause is the offense—*i.e.* the "bodily injury" and "dangerous weapon" variants are alternative factual means, not alternative elements—then it would fail to be a valid predicate for Section 924(c) under the categorical approach.  But if the clause is divisible into alternative elements, then the ways the statute can be violated due to the occurrence of "bodily injury," are irrelevant to the question of whether a Section 242 crime involving a dangerous weapon can serve as a predicate for a Section 924(c) charge.

"To determine whether the statute is divisible, we look to the statute's text and state court decisions interpreting it." *Stankiewicz v. Garland*, 103 F.4th 119, 129 (2d Cir. 2024) (quoting *Harbin*, 860 F.3d at 64–67).  Here, the statute's text, on its face, appears to suggest it is further divisible.  The clause employs "or" in setting off what appear to be two alternative elements through which the deprivation of rights under color of law could result in a 10-year felony: "if bodily injury results from the acts committed in violation of this section **_or_** if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire."  18 U.S.C. § 242 (emphasis added).  "While the disjunctive structure is 'not necessarily dispositive in finding divisibility,' it is 'indicative.'" *Ross*, 2026 WL 1500955, at *2 (quoting *Colotti v. United States*, 71 F.4th 102, 113 (2d Cir. 2023)).  Furthermore, the nature of the variants suggest they are not two "factual means of committing a single element." *Mathis*, 579 U.S. at 506.  In the context of other statutes containing similar alternatives set off by "or" within a clause, courts have found that "it strains conventional English to read an end ('bodily injury') and a means ('dangerous weapon,

24

explosive, or fire') as alternative ways of committing the same offense." *United States v. Doggart*, 947 F.3d 879, 888 (6th Cir. 2020) (finding 18 U.S.C. § 247(d)(3) internally divisible).[18]

The second point of reference is state court interpretations of the statute, but this tool is irrelevant where a federal statute is at issue. *See Rodella*, 435 F. Supp. 3d at 1253 (noting for the divisibility analysis in the "federal context of a federal statute," the court did not "find this tool relevant"); *cf. Tafflin v. Levitt*, 493 U.S. 455, 465 (1990) (explaining that federal courts have "full authority and responsibility for the interpretation and application of federal criminal law, for they [are not] bound by state court interpretations of the federal offenses"). Notably, when looking to other federal courts, it appears only two other courts have opined on the Section 242 divisibility issue, and both came to the same conclusion as the Court does. *See United States v. Brown*, No. 9:17-CR-80102 (RLR), 2018 WL 582536, at *3 (S.D. Fla. Jan. 25, 2018), *aff'd*, 934 F.3d 1278 (11th Cir. 2019) (divisibility not raised on appeal); *see generally Rodella*, 435 F. Supp. 3d at 1253–54 (degree of divisibility not explicitly re-evaluated on appeal).[19] While the Court is not bound by those decisions, they support a finding of divisibility of Section 242's second clause.

---

[18] *See also United States v. Buck*, 23 F.4th 919, 925–26 (9th Cir. 2022) (finding 18 U.S.C. § 2114(a) to contain divisible alternative elements because "[t]he second aggravated offense requires the 'use of a dangerous weapon' in a way that puts the life of the person with custody of government property in jeopardy, but does not necessarily wound that person. The first aggravated offense, meanwhile, requires the government to prove that the victim was wounded, but does not specify that the wound must be delivered by a dangerous weapon"); *cf. Mathis*, 579 U.S. at 506 (explaining that a hypothetical statute that "requires use of a 'deadly weapon' as an element of a crime and further provides that the use of a 'knife, gun, bat, or similar weapon' would all qualify" is an example of indivisible alternative factual means).

[19] Five other courts have considered the issue in some form. One declined to reach a conclusion, finding the issue was unripe because the predicate Section 242 offense had only been charged, but there was not yet a conviction on that charge. *See United States v. McInerney*, No. 18-CR-20584 (GAD) (APP), 2020 WL 3868499, at *4 (E.D. Mich. July 9, 2020). A second suggested in passing that Section 242 was divisible into only three alternatives, but did not consider the potential for further division before basing its conclusions on other grounds. *See Acosta v. United States*, No. 03-CR-0011 (MAT), 2019 WL 4140943, at *7 (W.D.N.Y. Sep. 2, 2019). Similarly, two federal circuit courts examined the issue of divisibility, and confirmed that

25

"If we cannot find a 'clear answer' from [the text of the statute and] state law sources, then [courts] may turn to 'the record of a prior conviction itself.'" *Stankiewicz*, 103 F.4th at 129 (quoting *Harbin*, 860 F.3d at 64–67). In this case, the record of Defendant's predicate Section 242 conviction likewise points to this conclusion. Here, Question 1(a) of the verdict sheet required the jury to answer whether, in committing the offense charged in Count One, Defendant had caused "bodily injury," and Question 1(b) asked the jury to answer whether, in committing the offense charged in Count One, Defendant had "used a dangerous weapon." (Dkt. 52, at 1.) The verdict sheet further instructed the jury that "[i]f you answered 'Yes' to Question 1(b), please proceed to Question 2[,]" which were the questions related to the Section 924(c) charge in Count Two. (*Id.* (internal quotation marks omitted).) The verdict sheet thus made clear that if the jury found Defendant had used a dangerous weapon in committing the Section 242 offense (as per Question 1(b)), then it was to then consider the Section 924(c) count. Importantly, this instruction was *not* given as to Question 1(a), the jury's finding as to bodily injury. Indeed, the jury instruction for Question 1 reiterated that "[i]f you answered 'Not Guilty' to Question 1" (Defendant's guilt as to the [Section] 242 charge in Count One), "or 'No' to Question 1(b)" (Defendant's use of a dangerous weapon), then the jury was *not* to proceed to "Question 2," the Section 924(c) count.

---

the statute is divisible into at least three offenses but those courts were not asked to consider further divisibility. *See United States v. Williams*, 343 F.3d 423, 434 (5th Cir. 2003); *United States v. Acosta*, 470 F.3d 132, 136 (2d Cir. 2006). Finally, in *Rodella*, the Tenth Circuit, which, as previously discussed, endorsed the three-clause division of Section 242, while not expressly opining on further divisibility of the second clause, recognized in a footnote that, while the defendant "was also charged under the 'bodily injury' provision of [Section] 242, [t]he jury did not . . . rely on that alternative, agreeing instead beyond a reasonable doubt that Rodella had 'used or threatened to use a dangerous weapon.'" 852 F. App'x at 328 n.6 (citation omitted). Though the Tenth Circuit did not expressly state that the "dangerous weapon" and "bodily injury" clauses were divisible, its dismissal of the "bodily injury" variant as the basis for the conviction and its subsequent categorical approach analysis of only the "dangerous weapon" variant, implicitly indicates a finding of divisibility.

26

(*Id.*)  In sum, the instructions told the jury that Section 924(c) was only to be considered if there was a "dangerous weapon" finding, while notably dictating that the availability of Count Two was not tethered in either direction to the jury's answer on "Question 1(a)," the "bodily injury" finding. The same was reflected in the Court's jury charges, which specified that it was the "dangerous weapon" finding specifically that was relevant to Count Two.  (Trial Tr. 1428–29.)[20]

Thus, each of the factors to be considered in determining divisibility, *see Stankiewicz*, 103 F.4th at 129, supports the conclusion that Section 242's second clause—*i.e.*, the 10-year felony clause—is divisible into two alternative elements.  Consequently, under the modified categorical approach, it is only necessary that the "dangerous weapon" variant of Section 242 be proved to serve as a predicate for a Section 924(c) violation.

As to the final step, comparing the elements of the conviction to the definition of the offense, Defendant makes two arguments.  First, he argues that, even as to just the "dangerous weapon" offense, one can "violate [Section] 242 with a dangerous weapon by brandishing or pointing a firearm to effectuate an unreasonable seizure—using the weapon as a show of authority—without deploying violent physical force against a person," and so it does not

---

[20] The Court instructed the jury that

> to prove the defendant guilty of Count One of the indictment, the government does not have to prove both that the offense resulted in bodily injury and that a dangerous weapon was used.  Proof beyond a reasonable doubt of one of these factors is enough to prove this element as long as all of you agree that the same factor has been proved.  However, in order to find the defendant guilty of Count Two, you must all unanimously agree that the government proved beyond a reasonable doubt that the offense charged in Count One, involved the use of a dangerous weapon.  If you all agree that the government has proven the crime charged in Count One, and you also unanimously agree that the government proved beyond a reasonable doubt that the offense involved the use of a dangerous weapon, then the first element of Count Two has been satisfied.

(Trial Tr. 1428–29.)

categorically qualify as a crime of violence under Section 924(c)(3)(A). (Def.'s Mot., Dkt. 73, at 20.) Defendant is incorrect here as well. Courts have found that the "'use' of a dangerous weapon" during the commission of an offense "supplies at minimum a 'threat' of physical force against the person of another." *See United States v. Redrick*, 841 F.3d 478, 484 (D.C. Cir. 2016) (discussing common law robbery); *see also United States v. Shannan*, 66 F.4th 1177, 1178 (8th Cir. 2023) (holding that "use" or "display" of a dangerous weapon under Iowa Code § 708.2(3) "requires at least the threatened use of physical force"). Defendant has supplied no authorities to the contrary, and the hypothetical he poses—an officer violating Section 242 by "brandishing or pointing a firearm to effectuate an unreasonable seizure," (Def.'s Mot., Dkt. 73, at 20)—only proves the point that the "use" of a firearm necessarily entails, at minimum, a "threat" of physical force.

Second, Defendant argues that because "[Section] 242's willfulness element encompasses 'reckless disregard' of constitutional rights," and that "[u]nder *Borden v. United States*, 593 U.S. 420, 428–29 (2021), an offense satisfiable by recklessness cannot categorically require force used against another," [Section] 242 cannot categorically qualify as a predicate offense for Section 924(c). (Def.'s Reply, Dkt. 80, at 2.) But this argument draws a false equivalence between a "reckless" state of mind in assessing whether a use of physical force was intentional and "reckless disregard" of constitutional rights in determining whether a defendant acted "willfully" in violating [Section] 242, whether by using physical force, causing bodily injury, or otherwise. *See Screws*, 325 U.S. at 104 (discussing the state of "reckless disregard" in the context of "willfulness," not as an alternative *mens rea*).

Defendant's argument hinges on *Borden*, where the Supreme Court held that "[o]ffenses with a *mens rea* of recklessness do not qualify as violent felonies under [the Armed Career Criminal Act ('ACCA')]" since "[t]hey do not require, as ACCA does, the active employment of

28

force against another person." 593 U.S. at 445. The Supreme Court's reasoning was, in part, that "crimes of violence" involve "a deliberate choice of wreaking harm on another, rather than mere indifference to risk." *Id.* at 438. But to the extent Section 242 possibly sweeps in any "reckless" but unknowing behavior, it is with respect to the subjective knowledge of constitutional rights, not whether the use of force is intentional.[21] Defendant has cited no authority (and the Court is aware of none) suggesting that one could use or threaten to use a dangerous weapon to violate Section 242 without having the specific intent to employ (or threaten to employ) force. Defendant's reading of *Screws* and Section 242 would essentially read "willfully" out of the statute and replace it with "recklessly." For this reason, Defendant is incorrect in arguing that Section 242 is "an offense satisfiable by recklessness." (Def.'s Reply, Dkt. 80, at 2.)

For the reasons stated above, the Court finds that a Section 242 violation involving the use of a dangerous weapon categorically qualifies as a crime of violence for purposes of a Section 924(c) charge and finds no basis for vacating Defendant's conviction under Section 924(c)(3)(A) in Count Two.

*    *    *

Accordingly, the Court denies Defendant's Rule 29 motion in its entirety.

---

[21] "*Screws* is not a model of clarity," *United States v. Johnstone*, 107 F.3d 200, 208 (3d Cir. 1997), but it is generally understood that the Supreme Court's description of "reckless disregard" pertained to a defendant's intent and knowledge vis-à-vis the constitutional rights being deprived, rather than whether the defendant's conduct was intentional, *see, e.g.*, *id.* at 208 ("The Court reconciles these facially inconsistent standards—that an individual can intend to violate a right even if the individual is not thinking in terms of any right—by recognizing that willfulness includes reckless disregard." (citing *Screws*, 325 U.S. at 105)); *United States v. Ehrlichman*, 546 F.2d 910, 921 (D.C. Cir. 1976) ("[E]ven if the defendant did not in fact recognize the unconstitutionality of his act, he will be adjudged as a matter of law to have acted 'willfully' i.e., 'in reckless disregard of constitutional prohibitions or guarantees.'" (quoting *Screws*, 325 U.S. at 106)). The phrase "reckless disregard" in *Screws* itself appears only in the context of a defendant's consciousness of constitutional rights and prohibitions. *See* 325 U.S. at 104–06.

29

## II.    Rule 33

### A.    Legal Standard

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and [only] in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

In making this determination, the Court "is not required to view the evidence in the light most favorable to the government," *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006), but instead must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation," *Ferguson*, 246 F.3d at 134. The court may "weigh the evidence" for itself, "and in so doing evaluate for itself the credibility of the witnesses," *Sanchez*, 969 F.2d at 1413 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)), but the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury," *Ferguson*, 246 F.3d at 133 (alteration in original) (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)). "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187–88 (2d Cir. 2020) (quoting *Sanchez*, 969 F.2d at 1414). Under the "preponderates heavily" standard, "a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more

30

reasonable.'"[22]  *Id.* at 188 (citation omitted).  Ultimately, the Court should only order a new trial under Rule 33 if "it would be a manifest injustice to let the guilty verdict stand."  *Sanchez*, 969 F.2d at 1414 (citation omitted).

### B.   Defendant's Arguments for a New Trial

Defendant argues a number of bases for why the Court should grant him a new trial.  None are persuasive.

#### 1.   Rule 404(b) Evidence

Defendant argues that he was prejudiced by the Court's admission of other acts evidence that he claims was inadmissible propensity evidence under Rule 404(b).  (Def.'s Mot., Dkt. 73, at 6–11.)

Rule 404(b) provides that evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  In this Circuit, other acts evidence is admissible "for any purpose other than to show a criminal defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)).  In other words, "such evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more

---

[22] Clear examples of when this standard is met include situations where: (1) "the evidence was 'patently incredible or defied physical realities,'" (2) "an evidentiary or instructional error compromised the reliability of the verdict," or (3) "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony."  *Landesman*, 17 F.4th at 331 (citation modified).

probative than prejudicial." *United States v. Flom*, 256 F. Supp. 3d 253, 266 (E.D.N.Y. 2017) (citing *United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013)). When a court admits 404(b) evidence, "the court must, if requested, provide a limiting instruction to the jury." *United States v. Henry*, 363 F. App'x 781, 783 (2d Cir. 2010) (summary order).

Defendant's motion takes issue with the Court's admission of the Carreras Evidence under Rule 404(b). The Carreras Evidence included: (1) Defendant's August 2023 statement to MDC-Brooklyn inmate Carreras that if Defendant saw a female visitor whom Defendant suspected of smuggling contraband return to the MDC-Brooklyn, she would "get shot in the head, and we'll be going to an early funeral," (Trial Tr. 752, 754–56); and (2) Defendant's confrontation with Carreras during which Defendant accused Carreras of drug smuggling and pulled out his firearm, cocked it, and ejected a bullet to the floor, (*id.* at 757–58). Defendant's motion makes three arguments that the admission of this evidence requires a new trial.

First, Defendant argues that the Carreras Evidence was "propensity proof in sheep's clothing"—*i.e.*, it was offered to show Defendant's propensity and willingness to use extralegal force and not for some proper purpose under Rule 404(b)(2). (*See* Def.'s Mot., Dkt. 73, at 7.) But the Government offered this evidence for the proper purpose of proving intent, namely, that Defendant had acted willfully—*i.e.*, his actions were not in self-defense and he knew he was exceeding his authority—during the September 4 Shooting. Since the evidence was offered for a proper purpose, and it was relevant to proving willfulness, the only question was whether the probative value was substantially outweighed by a danger of unfair prejudice under Federal Rule of Evidence 403, which the Court did not find. (*See* 10/09/2025 Oral Arg. Tr., Dkt. 81, at 25.) Defendant attempts to distinguish this case from *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) on the basis that the 404(b) evidence in *Livoti* "went to a sharply framed disputed issue."

(Def.'s Mot., Dkt. 73, at 8.)  But the same is true here; the admitted Carreras Evidence was highly probative of the key disputed issue of willfulness, especially since it was undisputed that Defendant had fired at the BMW.    Meanwhile, Defendant's prejudice argument, that the evidence is "significantly more sensational and disturbing than the charged crimes," (*id.* (quoting *United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011))), is also incorrect as mere provocative statements and the ejection of a bullet toward the ground are no more disturbing than the charged crime of engaging in a high-speed car chase and shooting and nearly killing the vehicle's passenger.  The Carreras Evidence was properly admitted for a non-propensity purpose and was not unduly prejudicial.[23]

Second, Defendant argues that the Court's limiting instruction to the jury did not cure the 404(b) evidence's prejudice as the instruction was "internally contradictory," and thus there was an "[o]verwhelming probability [that] the jury could not follow the instruction."  (*Id.* at 9.) Regarding the Carreras Evidence, the Court gave the following limiting instruction:

> The Defendant is not charged with committing any crimes other than those specifically alleged in the Indictment.  You have heard evidence of other acts allegedly committed by the Defendant.  That evidence was offered, and may only be considered for, a limited purpose.  The Government was permitted to offer that evidence solely for the purpose of showing . . . what the Defendant's state of mind was at the time of the September 4, 2023 incident that forms the basis of the charges against him, i.e., to assist you in determining whether the defendant acted knowingly, intentionally, willfully, and/or with a particular motive with respect to the charged offenses and not due to mistake, accident, or other innocent reasons.
>
> If you determine that the Defendant committed the acts charged in the Indictment and the similar acts as well, then you may, but you need not, draw an

---

[23] Defendant incorrectly claims that "the Court *sua sponte* reconsidered its pre-trial ruling admitting" 404(b) evidence. (Def.'s Mot., Dkt. 73, at 6.)  The Court did not reconsider its pre-trial ruling admitting the 404(b) evidence, (*see* Trial. Tr. at 1020 ("I still don't think that [the danger of unfair prejudice] outweighed the probative value of establishing willfulness, which is the Government's burden.")), and even if it had, it confirms now that it properly admitted the evidence.

inference that in doing the acts charged in the indictment, the Defendant acted knowingly, intentionally, willfully, and/or with a particular motive, and not because of some mistake, accident or other innocent reasons.

The Defendant is not on trial for committing those acts not alleged in the indictment.  Accordingly, you may not consider the evidence of those other acts as a substitute for proof that the Defendant has a criminal . . . personality or bad character.  *You also may not consider this other act evidence to conclude that the Defendant has some propensity to commit crimes, or that if he committed a similar act in the past, he must also have committed the crimes charged in the Indictment.* The evidence of other acts was admitted for a much more limited purpose and you may consider it only for that limited purpose.

(Trial Tr. at 1408–09 (emphasis added).)

Defendant argues that this curative instruction was "internally contradictory" because, although it told the jury *not* to conclude that "if [Defendant] committed a similar act in the past, he must also have committed the crimes charged in the Indictment," (Def.'s Mot., Dkt 73, at 9 (alteration in original) (quoting Jury Instructions, Dkt. 51, at 15)), "the only way the Carreras [E]vidence illuminates Wilson's state of mind on September 4 is through propensity reasoning— the inference that a person who threatens people with guns during contraband enforcement is the kind of person who would shoot at a car during a contraband operation," (*id.*).  As a threshold matter, Defendant has waived this argument, having not raised any objection to the curative instruction during the charge conference or when the Court charged the jury.  *See* Fed. R. Crim. P. 30(d) (requiring objections to jury instructions to be made before the jury retires to deliberate); *United States v. Shin*, No. 19-CR-0552 (JPC), 2022 WL 3274120, at *4 (S.D.N.Y. Aug. 11, 2022) (rejecting a Rule 33 argument for similar reasons).  In any event, Defendant is incorrect that "the only way the Carreras evidence illuminates [Defendant]'s state of mind on September 4 is through propensity reasoning," (Def.'s Mot., Dkt. 73, at 9).  Rather, as the Government argued, and as the curative instruction advised, the jury could consider the Carreras Evidence as showing that, in

34

shooting at the BMW, Defendant was motivated by a desire to prevent and punish contraband smuggling and that Defendant knew that his actions exceeded his authority and violated the constitutional rights of the BMW's occupants. In addition, by showing that Defendant's use of force was knowingly unauthorized and willful, the Carreras Evidence was also relevant to rebutting Defendant's claim that he acted in self-defense. *See United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997) (noting that the prior doing of other similar acts is relevant in terms of "reducing the possibility that the act in question was done with innocent intent"); *Devonbrook, Inc. v. Lily Lynn (Lilywear), Inc.*, No. 70-CV-4687 (LWP), 1977 WL 921, at *4 (S.D.N.Y. Jan. 10, 1977) (recognizing that, in the context of Rule 404(b), "where it is found that the very doing of an act gives rise to an inference that the actor possessed a non-innocent intent, e.g., criminal or fraudulent, but the actor gives an innocent explanation for the act, the trier of fact may infer from the happening of other similar acts that the act in question was the product of a non-innocent intent"). As Defendant acknowledges, the "Second Circuit generally presumes juries follow limiting instructions," (Def.'s Mot., Dkt. 73, at 9), and here, there is no reason to doubt that presumption.

Third, Defendant argues that the Carreras Evidence, when combined with the evidence of Defendant's false September 5, 2023 incident report, which Defendant acknowledges was properly admitted, created an unduly prejudicial "cumulative effect" that "transform[ed] the jury's task from evaluating the September 4 incident on its own facts to condemning Wilson as a violent, dishonest officer." (*Id.* at 10.) Defendant's only support for this argument is *United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022), (*see* Def.'s Mot., Dkt. 73, at 10), in which the Second Circuit concluded that three *erroneous* evidentiary rulings might have, in the aggregate, influenced the jury, and so a new trial was necessary. *Zhong*, 26 F.4th at 544. However, *Zhong* has little relevance here, since

35

even assuming, *arguendo,* that the Carreras Evidence was improperly admitted, the September 5 incident report evidence was properly admitted, and thus the purported "cumulative effect" of these two sets of evidence cannot support a finding of *unfair* prejudice under Rule 403. Furthermore, since the Court concludes none of its Rule 404(b) evidentiary rulings were erroneous, there is no basis for requiring a new trial based on the "cumulative effect" of both sets of properly admitted evidence.

### 2.    The Court's Rulings on Evidence of Defendant's Motive

Defendant takes issue with certain of the Court's evidentiary rulings, which he argues "created a systematic imbalance that prevented the jury from evaluating [his] conduct in the proper context." (Def.'s Mot., Dkt. 73, at 11.)  Specifically, Defendant argues that the Government was permitted to introduce evidence to prove its theory that Defendant "was bent on stopping contraband and used his position to engage in unauthorized, extralegal enforcement," but that the defense was precluded from introducing evidence "explaining why [he] was vigilant." (*Id.* at 10–11.)  The evidence Defendant argues should have been admitted related to "the scope and severity of the contraband crisis at the MDC-Brooklyn, the frequency of unauthorized vehicle incursions into the staff parking lot, [and] the violent criminal histories of the individuals involved in the smuggling operation (including that the intended recipient, Jowenky Nunez Jr., was a violent gang leader convicted of multiple murders)." (*Id.* at 11–12.)  Defendant's argument fails for two reasons.

First, there was no "asymmetry" in the evidentiary rulings, (*id.* at 12), as, contrary to Defendant's contentions, the defense was not precluded from introducing evidence of the prevalence of contraband smuggling at the MDC-Brooklyn.  In fact, Defendant was permitted to (1) elicit testimony on the perpetual nature of attempts to smuggle contraband into the MDC-Brooklyn, (Trial Tr. 424), the MDC-Brooklyn's efforts to prevent the entry of contraband into the

36

facility, (*id.* at 830), and the various types of contraband that posed a threat to the security of the MDC-Brooklyn, (*id.* at 946–47); (2) argue in summation about the degree of danger that the MDC-Brooklyn faces, due in part to contraband smuggling, (*id.* at 1345–46; 1355–56); (3) cross-examine witnesses about contraband smuggling at the MDC-Brooklyn, (*id.* at 421–24; 536; 764–68; 946–47; 991–93); and (4) offer his own testimony regarding his focus as an MDC-Brooklyn correctional officer on preventing the entry of contraband into the facility, (*id.* at 1027–43). Throughout the trial, the Court made explicit and careful rulings to ensure that the defense was not unfairly precluded from presenting evidence on these topics.  For example, before Defendant testified on his own behalf, the Court discussed with the defense and the Government what would be permitted and what would not be permitted on these topics.  The Court explained that "[t]he key here is it has to be tethered to why he did what he did[,] . . . [w]hat was his motivation," but that the Court did "not want him to talk about generalized violence at the facility," which the defense said was "not a problem." (*Id.* at 1015–16.)  Ultimately, the Court's rulings on this issue gave the defense "some ammunition to argue that there's a drug smuggling problem" at the MDC-Brooklyn.  (10/09/2025 Oral Arg. Tr., Dkt. 81, at 40.)  As a result, contrary to Defendant's argument now, the jury was not "denied the context that would have made [Defendant's] vigilance rational." (Def.'s Mot., Dkt. 73, at 12.)

Second, the Court properly limited the amount of this evidence because any additional evidence of contraband smuggling and general conditions at the MDC-Brooklyn would have been of minimal relevance and would have improperly invited jury nullification and/or a public safety justification.  Defendant sought the admission of evidence related to the contraband-driven dangerous conditions inside MDC-Brooklyn, but Defendant's case was predicated on his belief that he was pursuing an escapee (not contraband) outside MDC-Brooklyn property (not inside),

and that his shooting at a vehicle during a high-speed chase was in self-defense.  Indeed, Defendant's argument that evidence of the conditions at the MDC-Brooklyn was "necessary to evaluate whether Mr. Wilson acted willfully and unreasonably, or whether he responded—albeit imperfectly—to an environment rife with danger and instability," (Def.'s Opp'n to Gov't's Mot. *in Limine,* Dkt. 43, at 10–11), essentially acknowledges that the purpose of this evidence was to improperly suggest to the jury that Defendant was justified in using lethal force on September 4, 2023 in response to difficult conditions at the MDC-Brooklyn.  In other words, to invite jury nullification and a public safety justification.  In addition, evidence about violence at the MDC-Brooklyn, especially if linked to contraband smuggling, also could have caused the jury to improperly infer that the occupants of the BMW were dangerous, even armed, as suggested by Defendant during his testimony.

Thus, the evidentiary rulings identified in Defendant's motion were not erroneous and do not warrant a new trial.

### 3.     Defendant's Request for a Missing-Evidence Instruction

Defendant argues that he was entitled to a jury instruction permitting the jury to consider the Government's purported failure to promptly secure or preserve two pieces of evidence: the BMW, in which Defendant theorizes there was a firearm; and surveillance footage from the MDC-Brooklyn.  (*See* Def.'s Mot., Dkt. 73, at 12.)  Defendant claims that he "sought a missing-evidence instruction" at trial and that it was "error" for the Court to deny that request.  (*Id.*)  However, Defendant never sought such a jury instruction.  Indeed, Defendant does not point to anything in the record indicating that he did.[24]  There is therefore no "error" regarding a missing-evidence instruction that warrants a new trial.

---

[24] The only part of the record Defendant cites to is the Court's instructions to the jury.  (*See* Def.'s Mot., Dkt. 73, at 12 (citing Trial Tr. 1410).)  This part of the transcript includes the Court's

4.      Justification Jury Charge

Defendant argues that one of the Court's instructions to the jury was improper because it "delegated a legal question to the jury," (*id.* at 13), specifically, whether Defendant "had the authority to arrest anyone in the BMW at the time of the shooting, which occurred off of MDC property," (*id.* (quoting Dkt. 51, at 20)).   In Defendant's view, whether he possessed arrest authority is a legal question to be decided by the Court that "depends on the interpretation of 18 U.S.C. § 3050, the BOP's statutory authority, and New York Criminal Procedure Law § 35.30's 'peace officer' provisions." (*Id.*)   Regardless of the merits of Defendant's contention, it is inappropriately raised at this time given that Defendant requested the very jury charge he now objects to. (*See* Trial Tr. 1269–70 (arguing that "the jury has to be instructed on 18 U.S.C. [§] 3050," and agreeing that the jury could find that he did or did not "have authority")).   As a result, Defendant has waived this argument and cannot use it now to justify a new trial.  *See United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("A finding of true waiver applies . . . [when] defendants not only failed to object to what they now describe as error, but they actively solicited it."); *United States v. Young*, 745 F.2d 733, 752 (2d Cir. 1984) ("[N]ot even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge."); *United States v. Boyle*, No. 08-CR-0523 (CM), 2010 WL 4457240, at *10 (S.D.N.Y. Oct. 27, 2010) (applying the invited error doctrine to a Rule 33 motion and rejecting the defendant's arguments that the instruction he requested was erroneous), *aff'd*, 452 F. App'x 55 (2d Cir. 2011).

---

instructions that "[i]t is possible for a law enforcement officer to violate departmental and/or prison rules or policies or to violate training principles without violating the United States Constitution, just as it is possible for an officer to violate the Constitution without violating a specific state law or agency policy." (Trial Tr. 1410.)  Nothing in this part of the record reveals that the Court denied a missing evidence instruction, much less that Defendant requested one.

39

### 5.    Post-Closing Jury Instruction

Finally, Defendant takes issue with a supplemental instruction the Court gave to the jury, which the Court found was necessitated by the defense's summation.  (*See* Def.'s Mot., Dkt. 73, at 14–16.)  During summations, defense counsel made two statements calling for the jury to speculate about evidence that was not introduced at trial and about witnesses not called to testify at trial:

> [I]f Leon Wilson displayed a gun in the outer perimeter or anywhere in the MDC to Dylan Carreras, I submit to you that there's video of this somewhere.  That entire institution is constantly monitored, inside and out, but we have not seen any video of that.  They ask you to rely on the word of Dylan Carreras, the convicted liar, who had a business going in the MDC and Leon stopped that business.

(Trial Tr. 1352.)

> I want you to be fair and impartial jurors, but you should expect the government to answer some of these questions at least: Who is the occupant, the third occupant of the BMW?  Where is that person?  What type of gun did Kaylyn Nunez own?  Where is she?  You have her car.  You have her friend Erick. You have her address.  You also have the burden of proof.
>
> You may hear how Kaylyn Nunez was available to the defense but they chose not -- the government has the burden of proof.  They always do.  It never shifts to the defense.  They have the burden of proving guilt beyond a reasonable doubt.  Why wasn't she called as a witness?  You gave immunity to Carreras and Encarnacion.  You could have given Nunez immunity too.

(*Id.* at 1365.)

To address the improper calls for speculation, after summations, the Court supplemented the draft instructions discussed at the charge conferences to add a curative instruction to the jury:

> [T]he law does not require that all things mentioned during the course of the trial be produced as exhibits.  **In addition, you heard argument about how other evidence had to exist, such as surveillance video, but was not introduced at this trial.  You are not to speculate about whether any such evidence exists or what it might have shown.**  Your concern is to determine whether or not, based on the

40

evidence or lack of evidence presented at this trial, the Defendant's guilt has been proved beyond a reasonable doubt.

(*Id.* at 1402–03 (curative instruction in bold).)  Defendant argues that this curative instruction was improper for three reasons.

First, Defendant claims that the Court erred by including the curative supplemental instruction without giving Defendant warning in advance of summation since Rule 30 requires that the Court inform counsel of intended jury instructions before summation.  (*See* Def.'s Mot., Dkt. 73, 14–15.)  While it is true as a general matter that Rule 30 dictates that the "court must inform the parties before closing arguments" as to the intended jury instructions, Fed. R. Crim. P. 30(b), "[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given," *United States v. Goklu*, 173 F.4th 16, 26–27 (2d Cir. 2026) (alteration in original) (quoting *United States v. Civelli*, 883 F.2d 191, 195 (2d Cir. 1989)).  That discretion includes issuing a supplemental instruction where it is necessary to cure an issue arising during summations.  *See, e.g.*, *United States v. Patterson*, No. 21-1678-CR, 2022 WL 17825627, at *4 (2d Cir. Dec. 21, 2022) (summary order) (affirming conviction after finding that the "curative instruction the court issued after [the defendant's] closing argument," that included an incorrect statement of law, "was proper to clear up any potential juror confusion"); *United States v. George*, No. 11-CR-0250 (DLI), 2012 WL 2564373, at *15–16 (E.D.N.Y. June 29, 2012) (noting a curative instruction given after summations to correct prosecution's references during summation to stricken testimony).  The Court therefore acted within its discretion by issuing the curative instruction after summations. Furthermore, "[r]eversal on the basis of a Rule 30 violation is warranted . . . only 'where the defendant can show that he was substantially misled in formulating his [closing] arguments or otherwise prejudiced.'"  *United States v. Rommy*, 506 F.3d 108, 125 (2d Cir. 2007) (alteration in

41

original) (quoting *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000)).  As previously noted, the Court cautioned the parties after the Government's rebuttal presentation conference and the day before summations that should statements during summations implicate the agreed-upon instructions, the Court would need to address those statements and possibly alter the instructions. (Trial Tr. 1237–38.)  Accordingly, Defendant cannot contend that he was "substantially misled" in formulating his closing arguments.

Second, in Defendant's view, the curative instruction "crossed the line from neutral law-giving to judicial comment on the evidence." (Def.'s Mot., Dkt. 73, at 15.)  Specifically, Defendant argues that the instruction erroneously "singled out 'surveillance video' by name, tracking the precise evidence defense counsel had discussed, and characterized the defense's argument as impermissible 'speculation.'" (*Id.*)  Though Defendant suggests that the instruction was heavy-handed and "characterized the defense argument as impermissible," (Def.'s Reply, Dkt. 80, at 4), the instruction was in fact necessary and sufficiently neutral.  The only added instruction was that "[i]n addition, you heard argument about how other evidence had to exist, such as surveillance video, but was not introduced at this trial.  You are not to speculate about whether any such evidence exists or what it might have shown." (Trial Tr. 1403.)  The instruction was neutrally worded and narrowly tailored to dissuade speculation, and made no mention or characterization of defense counsel's arguments.  Such an instruction was well within the Court's discretion.  *See, e.g.*, *United States v. Melendez*, No. 20-3876-CR, 2022 WL 3640449, at *6 (2d Cir. Aug. 24, 2022) (summary order) (finding no abuse of discretion where district court issued curative instruction during summations after defense counsel made "impermissible arguments" regarding the

42

Government's failure to produce certain evidence);[25] *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (approving of district court's giving curative instructions labeling counsel's summation characterization as "speculation," directing the jury to "disregard it," and instructing the jury to focus on the evidence relevant to the charges); *United States v. Bacote*, 201 F. Supp. 3d 230, 234–36 (E.D.N.Y. 2016) (denying Rule 33 motion and finding that instructions to the jury to avoid speculating about specific evidence were necessary to "counteract defense counsel's 'deductions and theories not warranted by the evidence'" (quoting *Quercia v. United States*, 289 U.S. 466, 470 (1933)).

Third, Defendant argues that the instruction itself was erroneous because it "did not preserve the jury's right to consider the absence of surveillance footage as a basis for reasonable doubt." (Def.'s Mot., Dkt. 73, at 15–16.)  In support of this argument, Defendant cites *United States v. Saldarriaga*, 204 F.3d 50, 52–53 (2d Cir. 2000), (Def.'s Mot., Dkt. 73, at 15), in which the Second Circuit approved of a jury instruction that explained in detail the judge's reasons for finding defense counsel's arguments as to missing evidence to be "irrelevant," but nonetheless emphasized that the jury was still entitled to allow the absence of evidence to inform the jury's determination of reasonable doubt.  However, *Saldarriaga* does not do the work Defendant wants it to.  The mere fact that the instruction in *Saldarriaga* expressly instructed the jury that it could still factor the missing evidence into its "reasonable doubt" analysis does not mean that *Saldarriaga* requires such instructions, and the Second Circuit did not anchor its approval of the jury instruction on its "reasonable doubt" discussion.  *See Saldarriaga*, 204 F.3d at 52 (discussing

---

[25] The district court in *Melendez* instructed the jury that "[t]he question in this case is whether the proof that the government has presented, and has been presented overall, satisfies you beyond a reasonable doubt of guilt.  It is not about evidence that you haven't seen."  Tr. 1193, *United States v. Melendez*, 17-CR-00791 (LAK) (S.D.N.Y. filed Dec. 28, 2017).

43

the district court's "instruction concerning the government's failure to use certain investigative techniques"). Furthermore, in contrast to the protracted instruction in *Saldarriaga* that might have heavily influenced the jury if not for the discussion of "reasonable doubt," here, the Court's two sentence supplemental instruction merely told the jury "not to speculate about *whether* any such evidence exists or *what* it might have shown." (Tr. 1403 (emphasis added).) A reasonable juror would not interpret this limited instruction as precluding them from "consider[ing] the absence of surveillance footage as a basis for reasonable doubt." (*Contra* Def.'s Mot., Dkt. 73, at 16 (emphasis omitted)); *see United States v. Sutherland*, No. 11-CR-20129 (SKD) (EAS), 2015 WL 225501, at \*5 (E.D. Mich. Jan. 16, 2015) (denying objections to similar language as used here, "which is part of the court's standard instructions," and "in no way suggests that reasonable doubt could not arise from a lack of evidence").

\*   \*   \*

**CONCLUSION**

For the foregoing reasons, Defendant's motion for acquittal, and, in the alternative, a new trial, is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 8, 2026
      Brooklyn, New York

44